KATHERINE McCORKLE *et al.*, Plaintiffs-Appellants, v. TYLER REPORTING COMPANY *et al.*, Defendants-Appellees.

First District (2nd Division)  No. 86—1252

Opinion filed July 28, 1987.

Katz, Randall & Weinberg, of Chicago (William Biederman and David C. Kluever, of counsel), for appellants.

William J. Harte, Ltd., of Chicago (William J. Harte and Jeffrey B. Whitt, of counsel), for appellees.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

On December 20, 1983, plaintiffs Katherine McCorkle and Charles McCorkle, Jr., filed a four-count complaint against defendants, Tyler Reporting Company (Tyler), Joseph Bertrand, Jason R. Bertrand, and MBC Reporting Company. In their complaint plaintiffs sought 60% of the net profits of Tyler, alleging that Charles McCorkle, Jr. (McCorkle), and Joseph Bertrand (Bertrand) entered into a partnership agreement to create Tyler and that Bertrand breached that agreement. On April 15, 1986, following a bench trial, the Honorable Anthony J. Scotillo entered judgment in favor of defendants, from which order the plaintiffs appeal. Nevertheless, the trial court entered judgment in favor of plaintiffs on count V of their amended complaint for reimbursement of expenses incurred by plaintiffs in organizing the corporation in the amount of $773.79. Neither party appeals from that portion of the trial court's order. MBC Reporting Company never began operations and is not a party to this appeal.

Bertrand was the alderman of the 7th Ward of the city of Chicago until May 31, 1983, but when the wards of the city were remapped following the 1980 census, Bertrand's residence was located in the 5th Ward. He ran for election as alderman of that ward in the primary of 1983 and lost. In May and June of 1983, Bertrand discussed his employment prospects with Tim O'Hara (O'Hara) of the city of Chicago's corporation counsel's office. Bertrand had known

O'Hara for 15 to 20 years and took up with him a number of different employment opportunities, including the possibility of entering the court reporting business.

After speaking with Bertrand, O'Hara arranged a luncheon meeting for him and McCorkle, who at that time was operating the largest court reporting concern in Chicago, and whom O'Hara had known for approximately 15 years. At this meeting, McCorkle told Bertrand that he knew many people who had tried to get into the court reporting business; that it was a very tricky, treacherous enterprise upon which to embark; that there were problems with court reporters and clients; and that it was difficult to finance such a business. McCorkle contended that court reporting for labor unions and utility companies, whose business Bertrand was desirous of obtaining, was not considered to be particularly lucrative. McCorkle testified that at this initial meeting with Bertrand he did not discuss court reporting for the courtrooms in which building code violations were heard because he believed such work to be the "best plum" in Chicago (*i.e.*, the easiest and most profitable to manage).

At trial, the parties agreed as to the events which took place between them up to and including this meeting, but they disagreed about the relationship they had afterward. Bertrand testified that during the spring and summer of 1983 he had general conversations with a number of people, besides McCorkle, with regard to entering the business of court reporting, and that during that time period he believed he had 5 to 10 meetings with McCorkle. McCorkle did not testify as to the number of times he met with Bertrand.

According to Bertrand, he decided in the latter part of June of 1983 to enter into a court reporting venture, and discussed his decision with McCorkle. At the outset, Bertrand told McCorkle that minority enterprises would be receiving and would have more opportunity to participate in city business and that he planned to obtain some of it. Bertrand testified that he sought McCorkle's assistance because he thought he should hire somebody who was proficient in court reporting to manage the business. His belief was allegedly based on McCorkle's statements that it would be too difficult for Bertrand to operate the entity by himself.

Bertrand testified that he explained to McCorkle that he was organizing a family enterprise, with his son as president and sole shareholder, and that they would pay an outside consultant to manage the business. It was Bertrand's understanding, given his explanation to McCorkle and McCorkle's continuing thereafter to be involved in establishing Tyler, that McCorkle had agreed to be such a consult-

ant to the operation. Bertrand testified that when he tried to determine the amount of McCorkle's counseling fees, McCorkle would not discuss the subject, but responded only that they would resolve the issue later. Nevertheless, Bertrand asserted that he told McCorkle that he expected him to operate the entity as a consultant.

McCorkle's version of their conversations varies greatly from that of Bertrand. He testified that approximately one week after their first meeting he telephoned Bertrand and they agreed upon another luncheon meeting. At this meeting McCorkle suggested a relationship with Bertrand whereby Bertrand would use his connections to obtain clients and McCorkle would manage the business. Specifically, McCorkle envisioned an arrangement similar to that which he previously had with one Al Gorski (Gorski). McCorkle told Bertrand that he and Gorski had a partnership agreement wherein Gorski utilized his contacts in City Hall to obtain court reporting work, while McCorkle provided the court reporting services and operated the organization on a day-to-day basis. McCorkle testified that he suggested that he and Bertrand could have the same type of relationship.

After lunch the two men returned to McCorkle's office and discussed his proposal in greater detail. McCorkle explained that generally 60% to 65% of gross receipts were allocated to pay court reporters' salaries and the remainder was gross profit, which was then divided 45% to McCorkle, 45% to Gorski, and 10% to cover all other expenses. McCorkle stated that this 10% figure had proved to be inadequate to cover overhead and other expenses, so he proposed that he and Bertrand divide the gross profits 40% each, with the remaining 20% to be used for expenses. Any unused portion of the 20% would belong to McCorkle.

According to McCorkle, Bertrand objected to the 40-40-20 split. He also testified that he told Bertrand that there were many other opportunities for lucrative work, including the probate and divorce courts. He contended that he met Bertrand for lunch the next day, at which time Bertrand again objected to McCorkle's proposed division of the profits. McCorkle testified that he reiterated that he would not negotiate those figures, and that after returning to his office, Bertrand reluctantly agreed to the proposed split.

McCorkle testified that the word "consultant" was never used in his discussions with Bertrand and that the parties did not contemplate a consultant relationship. According to McCorkle, he would not have considered such an arrangement because the deal was worth a net of $75,000 to $80,000 per year and he was "not going to put this

whole package together for anything less than a piece of the action, a substantial piece of the action." He also alleged that the conversations he had with Bertrand were far-ranging and in-depth and amounted to a tutorial on how to operate a court reporting business.

In the meantime, Bertrand had taken steps toward obtaining a contract with the city. He contacted persons in the city administration relative to obtaining court reporting work and spoke with Dan Welter (Welter), who headed the agency that was in charge of the court reporters for the building courts. According to Bertrand, in late June or early July he told Welter that he was in the process of organizing a minority-owned corporation closely held by his family and that he was interested in obtaining court reporting business from the city. After Welter advised him that he should submit a formal letter to the corporation counsel, Bertrand met with corporation counsel James Montgomery (Montgomery), a long-time personal friend, to discuss doing the city's court reporting. Bertrand testified that before this meeting he informed McCorkle of his plans, his friendship with Montgomery, and kept him apprised as to his progress.

Bertrand also investigated the manner in which bills presented to the city were processed and paid because McCorkle had indicated that the city had created problems for him in the past by being very slow in paying its bills; however, as a former city treasurer Bertrand was familiar with fiscal procedures at City Hall and learned how to have bills processed in order that they would be paid within 10 days. In addition, Bertrand testified that he requested an attorney to form a corporation with Jason Bertrand (Jason) as sole shareholder, as had been allegedly agreed to by McCorkle. Simultaneously, McCorkle ordered stationery and letterheads in the name of Tyler, had a telephone line installed, and he contacted the American National Bank to discuss financing Tyler.

Tyler sent a letter dated August 6, 1983, signed by Jason, to Montgomery soliciting the city's business. Bertrand testified that this letter was typed in McCorkle's office and that he discussed the letter with McCorkle as evidenced by the fact that it mentioned video depositions, the reporting of environmental cases, etc., with which Bertrand contended he was not familiar. Although McCorkle told Bertrand that these statements were necessary inclusions in the letter, there is no evidence that the city had any such requirements. On that same date, Tyler sent a letter, also signed by Jason, to the city's acting purchasing agent, setting forth Tyler's court reporting rates and a list of court reporters' names. Bertrand testified that this list

was compiled with McCorkle's help and included primarily the names of reporters in the building code courtrooms because as independent contractors they were likely to be willing to continue to work at their same jobs for a different employer. McCorkle denied participating in the drafting of the Tyler letters. He also testified that he was unaware that the disclosure statement filed with the city of Chicago stated that Tyler was a minority-owned business, despite his deposition statements to the contrary.

Tyler then received a document entitled "Recommendation of Award" which authorized it to work for the city, and in a letter dated August 23, 1983, Montgomery authorized Tyler to proceed with court reporting services in the building code courtrooms, beginning on August 29, 1983. McCorkle testified that he and Bertrand had been maintaining low profiles because McCorkle wanted to keep the fact that they were getting city business secret and did not want to admit that he was a partner with a person whom he did not consider to be a "class individual." Finally, McCorkle and Bertrand met with the court reporters. One court reporter testified that McCorkle asked, "Would you like to work for us?" McCorkle, on the other hand, testified that in the meeting with the reporters he referred to Bertrand and himself as partners. According to McCorkle, the night before the transition he told Bertrand he would agree to the same division of net profits that he had with Gorski, but Bertrand did not respond to the offer. There were some problems with the transition the next day, which both parties worked on resolving.

Bertrand testified that he had a meeting with Montgomery in which the latter stated that he wanted to make it clear that Tyler had to be a minority owned and operated business in order to do reporting for the city. Bertrand explained to McCorkle that Montgomery did not want McCorkle to own any part of the business; that it was acceptable to have whites working for it but it should not appear as though any of them had partial ownership of a black enterprise. Accordingly, Bertrand told McCorkle that he thought "officing [in McCorkle's office] and the relationship as it existed would have to be terminated because it was giving the appearance of being a front." Bertrand contended that McCorkle agreed to this arrangement, but McCorkle testified that he responded to Bertrand by stating that he did not believe the story and that it was just a plot to remove McCorkle.

The circuit court announced several conclusions of law, among which were the following:

> "3. The evidence failed to establish that there was ever a

partnership agreement between the parties involving the ownership of the aforesaid court reporting business.

4. The evidence established that defendants sought Charles McCorkle's advice and had discussions with him concerning the day-to-day operations of the aforesaid court reporting business. The evidence further established that while the parties may have contemplated the possibility of plaintiffs managing the day-to-day operations of the corporation, such a contemplated arrangement was mutually abandoned by the parties at the inception of the corporation's doing business."

OPINION

■ The parties recognize that the issue of whether a partnership exists "is normally a question of fact for the finder of fact, and its decision will not be disturbed unless manifestly against the weight of the evidence. (*Koestner v. Wease & Koestner Jewelers, Inc.* (1978), 63 Ill. App. 3d 1047, 381 N.E.2d 11.)" (*Peterson v. Prince* (1981), 102 Ill. App. 3d 220, 224, 430 N.E.2d 297.) Manifest weight means a level of proof that leads to a result "which is clearly evident, clear, plain and indisputable." *Laroia v. Reuben* (1985), 137 Ill. App. 3d 942, 946, 485 N.E.2d 496; accord *Singles v. Horwitz* (1975), 34 Ill. App. 3d 973, 342 N.E.2d 220.

■ ■ The parties also agree that a partnership can be formed without a written partnership agreement (see *Laroia v. Reuben* (1985), 137 Ill. App. 3d 942, 946, 485 N.E.2d 496; *Ramacciotti v. Simpkins* (1970), 130 Ill. App. 2d 733, 735, 266 N.E.2d 700), even though the business entity is incorporated. (See *Koestner v. Wease & Koestner Jewelers, Inc.* (1978), 63 Ill. App. 3d 1047, 381 N.E.2d 11.) In the absence of a written partnership agreement, as is the case here, we must examine the intent of the parties when ascertaining whether a partnership was formed (*Ramacciotti v. Simpkins* (1970), 130 Ill. App. 2d 733, 735, 266 N.E.2d 700; *Olson v. Olson* (1965), 66 Ill. App. 2d 227, 213 N.E.2d 95), and when making this determination we must also examine the facts and circumstances surrounding the alleged formation of such an entity.

In an oft-cited passage, the court in *Olson* set forth some of the indicia which help to determine the existence of a partnership:

"the manner in which the parties have dealt with each other; the mode in which each has, with the knowledge of the other, dealt with persons in a partnership capacity; whether they have filed with the county clerk, a certificate setting forth the name of the partnership, in event the firm name does not in-

clude the true name of the persons transacting such partnership business (Ill Rev Stats 1965, c 96, pars 4—8a); whether they have carried telephone listings and signs on trucks, etc., using the firm name; and whether they have shared the profits of the partnership." 66 Ill. App. 2d 227, 233, 213 N.E.2d 95.

McCorkle and Bertrand gave starkly contrasting testimony regarding the substance of their conversations and their dealings with each other. Even if we accept, *arguendo*, McCorkle's testimony over that of Bertrand, we find that there apparently never was any agreement on several vital terms of their alleged partnership agreement, including, for example, the scope of Tyler's operations and the duration of the purported partnership. The absence of a meeting of the minds relating to such critical terms leads irresistibly to the conclusions that the parties did not have the intent necessary to create a partnership. *Ramacciotti v. Simpkins* (1970), 130 Ill. App. 2d 733, 735, 266 N.E.2d 700; *Olson v. Olson* (1965), 66 Ill. App. 2d 227, 233, 213 N.E.2d 95.

Another precept advanced in *Olson* relevant to the case at bar is the manner in which a party has, with the knowledge of the other party, represented the relationship to third parties. Bertrand testified that McCorkle knew that Tyler was registered with the city as a minority business wholly owned by Jason. Bertrand also contended that McCorkle was aware that Bertrand told city officials that Tyler was his own business. Meanwhile, McCorkle testified that he ordinarily would not tell people that he was forming a partnership with Bertrand, but that in the meeting with the court reporters he explained that he and Bertrand were partners. On the other hand, a court reporter testified that McCorkle merely said that the two men would be running the operation. That statement, however, does not necessarily imply that they were partners; it would still be an accurate description of the job of a consultant, which was the position with Tyler that Bertrand claimed he intended for McCorkle to hold. Thus, Bertrand and McCorkle apparently were generally not referring to Tyler as their partnership in their relations with third parties. Indeed, it is not even clear that they were referring to it as a partnership at all. It is especially noteworthy that McCorkle himself testified that he did not want to admit that he was a partner with a person whom he did not consider to be what he characterized as a "class individual."

■ Moreover, we must remember that the burden of proving the existence of a partnership was McCorkle's (*Kreb v. Mini* (1977), 53 Ill. App. 3d 787, 793, 368 N.E.2d 159), and that clearly he failed to

sustain that burden of proof. Therefore, as the evidence in this case was at most contradictory, thus creating a credibility issue for the trial court to resolve, we are obliged to uphold its decision that a partnership was never formed by the parties herein. We wholeheartedly agree with the court in *Peterson*, which, when confronted with a similar situation, held as follows:

"What is clear from the evidence on the question of the existence of the partnership is that credibility questions and contradictory evidence abounded. As has been repeatedly noted, in such cases the trial court is in the superior position to make determinations on the evidence. Only where his resolution of the questions is manifestly against the weight of the evidence will a reviewing court overturn his findings. (*Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, 226 N.E.2d 624.) In the instant case, we find no sufficient basis to overturn the court's finding \*\*\*." *Peterson v. Prince* (1981), 102 Ill. App. 3d 220, 224-25, 430 N.E.2d 297.

Because it is our conclusion that a partnership was never formed between McCorkle and Bertrand, we need not reach the trial court's alternative ruling that Bertrand lawfully dissolved the partnership. Nor is there any need to decide the question of whether McCorkle is entitled to *quantum meruit* for the services he performed as a consultant for Tyler, in view of the fact that he did not request such relief in his amended complaint. We quite agree that the only remedy McCorkle is entitled to is a sum equal to the amount of expenses he incurred in helping to form Tyler, which was precisely the relief granted by the trial judge. Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

STAMOS and BILANDIC, JJ., concur.