PATRICK T. MALONEY, Plaintiff and Counterdefendant-Appellee and Cross-Appellant, v. JAMES PIHERA, Defendant and Counterplaintiff-Appellant and Cross-Appellee (Lake Carlyle Development Company, Inc., Defendant).

Fifth District   No. 5—89—0475

Opinion filed June 19, 1991.

Kevin F. Lynch, of Wheaton, for appellant.

Katherine A. Williams, of Chicago, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:

This appeal arises from a dispute as to business dealings between Patrick Maloney and James Pihera. Between Maloney and Pihera, the parties purchased six parcels of real estate: (1) the Moak property, by Pihera; (2) the Wesley Griffin property, by Maloney; (3) the Ceretta

property, by Pihera; (4) the Ballance property, by Maloney in his mother's name; (5) the Victor Griffin property, by Maloney, subject to a nomineeship agreement; and (6) the Belcher property on a contract for deed to the parties as tenants in common. It was the parties' intention to develop these parcels into condominium-campsites and camping-related endeavors. For the purpose of developing the properties, construction equipment was purchased and placed in the Lake Carlyle Development Company, Inc. (the corporation), an entity created by the parties. A rough illustration of the location of the properties is as follows:

In 1981 Maloney and Pihera had a falling out. Maloney filed a three-count complaint in the circuit court seeking (1) a mandatory injunction to enforce the Victor Griffin property nomineeship agreement, an accounting, and damages for its breach by the nominee James Pihera; (2) liquidation and appointment of receiver of Lake Carlyle Development Company, Inc.; and (3) a declaration of the parties' equitable interest in the Belcher property. Pihera filed an answer and counterclaim seeking a finding of an oral partnership agreement between the parties as to all properties, a dissolution of the partnership, and a settlement of the partnership accounts between the parties.

After a bench trial, the court entered judgment in favor of Maloney and against Pihera in the amount of $27,067.63 for unjust enrichment and $50,000 for breach of contract. The court found that while the parties attempted to form a partnership, there never was a true meeting of the minds on the terms and conditions of said partnership. The court ordered the corporation property sold and the net proceeds divided equally between the parties. The court also ordered

the Belcher property sold and the net proceeds divided equally between the parties after a credit of $3,892 was given to Pihera. On Pihera's counterclaim, the court awarded Pihera damages arising from an oral lease agreement on the Belcher property.

Following a hearing on Pihera's post-trial motion, the court entered an amendment to judgment which stated that there was no basis in the pleadings for Maloney to claim damages upon a theory of unjust enrichment and denied Maloney damages upon that theory. The court also struck that portion of its original judgment awarding damages for breach of contract. Maloney was thereafter granted leave to file a fourth count to his complaint, which sounded in unjust enrichment. Following the addition of count IV to Maloney's complaint, the court entered a second amendment to judgment. The second amendment to judgment vacated those portions of the amendment to judgment which denied relief based upon the theory of unjust enrichment. In addition, the second amendment to judgment awarded Maloney $27,067.63 based upon the theory of unjust enrichment. Both parties appeal from the trial court's judgment. Both raised the issue of whether an error in integration was made in the judgment entered by the trial court. Pihera's appeal presents the following issues for review: (1) whether the trial court erred in finding that no partnership existed; (2) assuming a partnership existed, whether pursuant to the Uniform Partnership Act the court should have ordered a dissolution of the partnership; and (3) whether the court erred in its assessment of damages. Maloney's cross-appeal raises the issue of whether Maloney should be entitled to damages for funding the down payment on the Belcher property and for his maintenance of a business presence on the Belcher property. As both parties concede that an error was made in the trial court's amendment to judgment, we will dispose of that issue first.

■ The transcript of the hearing on Pihera's post-trial motion clearly establishes that at that hearing the dispute was over damages concerning Maloney's unjust enrichment claim. The introductory remarks to the findings in the court's amendment to judgment refer only to the award of damages for unjust enrichment. It is paragraph 2 of the court's findings which we are asked to concern ourselves with here:

> "Plaintiff is denied damages upon a theory of unjust enrichment and Subparagraph b. of Paragraph 1. of Paragraph I. of the Judgment is stricken."

Both parties agree that the trial court erroneously struck subparagraph *b* of paragraph 1, which is the breach of contract award, in-

stead of subparagraph *a* of paragraph 1, which is the unjust enrichment award.

Based on our review of the record, the court's failure to strike subparagraph *a* instead of subparagraph *b* is clearly an error of form, not substance. To remand this cause for the trial court to correct the technical inconsistency would serve no purpose but to delay the ultimate disposition of the litigation. (*Hough v. Mooningham* (1986), 139 Ill. App. 3d 1018, 1021, 487 N.E.2d 1281, 1284.) Pursuant to our authority under Supreme Court Rule 366(a)(5) (134 Ill. 2d R. 366(a)(5)), the circuit court's amendment to judgment is hereby modified, substituting an *a* for the *b* designated in paragraph 2 as indicated.

With regard to the remaining issues, a detailed account of the parties' testimony at trial is unavoidable.

### PATRICK MALONEY'S TESTIMONY

Maloney testified that he was from the Chicago area. He met Pihera in 1979, and shortly thereafter they discussed investments. Maloney traveled by airplane on several occasions to meet Pihera in the Lake Carlyle area. On an initial visit in June 1979, they discussed the possibility of investing in a motel with the intention of remodeling it into office space. The men viewed two motels and Pihera drove Maloney around Lake Carlyle. The prospect of purchasing and developing property around the lake was not discussed during this visit.

During another trip to the Lake Carlyle area in the summer of 1979, Pihera once again drove Maloney around the lake. He showed Maloney camping projects that had developed on the west side of the lake and told Maloney that he had purchased a parcel of real estate on the east side of the lake, referred to as the "Moak" property. Pihera expressed his desire to develop the east side of Lake Carlyle, and he indicated that there were other properties available in the area that could be purchased for that purpose. Maloney insists on appeal that no formal business relationship was created between the parties during the summer of 1979.

On a subsequent trip to the Lake Carlyle area, Pihera showed Maloney the Wesley Griffin property and advised Maloney that it was something that could be purchased. Maloney purchased the property in his name alone around September of 1979. Although Maloney testified that at the time he purchased the property the parties had only discussed the possibility of entering into a business relationship for the purpose of development, he believed that he was buying the Wesley Griffin property for the purpose of developing condominium campsites.

During the ensuing months the parties discussed purchasing other parcels of property that would be acquired by each of them in their individual names and eventually brought together in "some sort of entity." Approximately three to six months after the purchase of the Wesley Griffin property, Maloney and Pihera came to an oral agreement as to how Pihera would be compensated if the parties' business came into existence. They agreed that Pihera would receive $100 per week, representing wages for a nine-hour work week and gasoline expenses of $10 per week. The parties agreed that the $100 compensation was to come out of the profits of the business only if the business was successful.

In accordance with their tentative plan to develop the area on the west side of Lake Carlyle, Pihera purchased the Ceretta property in Pihera's name, and Maloney purchased the Ballance property in Maloney's mother's name. Maloney testified that sometime in late 1979, or early 1980, their relationship had evolved to the point that they considered putting the four parcels into a corporation or land trust or some other business entity. No formal action was taken, however.

At this time Pihera advised Maloney that because Pihera had found certain properties, he should receive a finder's fee. Pihera also desired compensation for expenses he had incurred in acquiring the properties and for his general experience in development projects such as the one they contemplated. The parties agreed that should they merge their assets into a land trust or other entity, Pihera's contribution at this point was equal to $100,000. This figure was calculated as follows:

| | |
|---|---|
| Fair Market Value of Moak Property | —$46,000 |
| Fair Market Value of Ceretta Property | —$46,000 |
| Finder's Fee, Travel Expenses, and Experience | —$8,000 |

Maloney and Pihera determined that once Maloney had expended $100,000 toward the purchase of property and the payment of expenses, the parcels of real estate acquired by the parties would be put into a corporation, joint venture, or other business entity. Until Maloney expended $100,000, the properties were to be owned individually, and all activities between the parties were to be conducted on an individual basis. Maloney's expenditure of $100,000 included, but was not limited to the following:

| | |
|---|---|
| Purchase Price of Wesley Griffin Property | —$40,000 |
| Purchase Price of Ballance Property | —$35,000 |
| Down-payment on Victor Griffin Property | —$12,500 |

In order to reach his goal, Maloney bore the cost of expenditures in-

curred by both him and Pihera until approximately February 26, 1981, when the parties began sharing expenses.

Admitted into evidence were Maloney's ledger and exhibits which Maloney contend support his testimony as to his expenditures on the various properties. These documents list the following expenses which Maloney contends he personally paid for:

Lake Carlyle Development Corporation
$676 — incorporation expenses
$9,000 — tree spade

Ceretta property
$600 — mowing, tractor, rubbish
$2,561 — taxes, surveying costs, repairs to shed
$2,706 — cedar fence, road

Moak property
$780 — trees, discing, mowing, tractor, rubbish
$256 — real estate taxes
$300 — road

Wesley Griffin
$5,413 — labor costs, rental of equipment, interest expense, repair and maintenance of property, surveying costs, real estate taxes

Maloney general expenses
$15,778 — expenses incurred in the initial acquisition and development of the properties

In 1980 the parties discussed developing an additional piece of property for the purpose of taking in outside investors to raise capital for use in developing the parcels they had already acquired. They agreed to purchase the Victor Griffin property to achieve this purpose. Maloney paid the down payment of $12,500 because he was still trying to meet his goal of $100,000, but the property was purchased in Pihera's name subject to a nomineeship agreement naming Pihera as nominee for Maloney. The purchase of the property was done in this manner so as to protect Maloney's assets in connection with an unrelated investigation being conducted against Maloney. Maloney eventually paid the mortgage on the Victor Griffin property in full. Pihera's monetary contribution to the Victor Griffin property consisted of one tax payment.

In the late fall of 1980, the parties discussed the purchase of the Belcher property, which included a bait shop, campground, boat dock,

and package liquor store. Maloney testified that Pihera kept holding up the final negotiations on the purchase by insisting that they hire a manager for the property before they bought it. In July 1981 they hired Bill Hahn to serve as manager of the Belcher property. Hahn was a high school friend of Maloney's who agreed to relocate his family from Wisconsin to Lake Carlyle to assume the position of manager.

Maloney testified that originally Pihera alone was supposed to purchase the Belcher parcel. However, sometime prior to closing the deal, both agreed to pay one-half of the purchase price. Maloney thought that both he and Pihera would pay one-half of the $25,000 down payment on the day of closing, but Pihera brought a check for only $500 and advised Maloney that Maloney should pay the balance of the down payment because Maloney owed him money. Not wishing the purchase to fall through, Maloney paid the $24,500, and in August 1981, the parties became owners of the Belcher property.

There was a package liquor facility on the Belcher property, and in order to acquire and maintain a liquor license, Maloney agreed to set up full-time residence on the Ceretta property. From July 1981 until approximately December 1981, Maloney lived in a house on the Ceretta property. During that time Bill Hahn also lived there. This was prior to Hahn's family joining him from Wisconsin.

Maloney agreed to lease the Belcher bait shop for the first year, and he paid Pihera $200 per month in accordance with the leasing terms he and Pihera had discussed. Maloney was never presented with a written leasing agreement even though he continually asked Pihera for the document. Hahn and Maloney shared the work load on the Belcher property. In 1981 Pihera contributed minimal effort, even though he and Maloney agreed that Maloney would tend to the bait shop and Pihera would handle the campground and other "outside" tasks. While Maloney worked on the property full-time from July 1981 to December 1981, he worked there only on weekends during 1982 and 1983. Pihera did no work on the property during 1982 and 1983.

Turning to the Wesley Griffin property, Maloney's ledger shows an expenditure on the Wesley Griffin property in the amount of $52,261.63, which Maloney contends he personally expended. Most of this amount was for the construction of the Crackerneck Sportsmen's Club, which Maloney established. In 1981 Maloney mortgaged the Wesley Griffin property to obtain $57,000 which was used to purchase the Belcher property and to pay off small improvement loans on the Wesley Griffin property. Foreclosure on the Wesley Griffin property

occurred in 1984, and a deficiency judgment of $4,806.44 was entered against Maloney.

Maloney testified that while farm rental income was generated from the Moak, Ceretta, and Wesley Griffin properties, no money was received directly by the parties. Any rental income was used to pay expenses and the only exception to this arrangement was once when Maloney received $50 for rent due on the Wesley Griffin property.

As for the Ceretta property, Maloney testified that he paid for the repairs to the shed, construction of a cedar fence around the property, and surveys conducted on the property. The ledger admitted into evidence shows an expenditure of $5,867 on the Ceretta property, which Maloney contends represents the amounts personally expended by him. Maloney spent weekends at the Ceretta property cutting trees and preparing a roadway and campsites. Maloney was never paid for the physical work he performed.

### JAMES PIHERA'S TESTIMONY

James Pihera met Patrick Maloney in April of 1979. After a few meetings to discuss various investment opportunities, they decided to form a partnership. Pihera testified that after he showed Maloney the property around Lake Carlyle and told him of his desire to develop a campground, Maloney expressed an interest in becoming a partner in the project. Pihera accepted Maloney's offer to become a partner on June 2, 1979, and the men agreed that the details of their partnership would be worked out at a later date. They agreed at that time to work together to develop all of the property from the boat launch out to the main road.

Pihera's contention that a partnership agreement exists is based largely on certain statements made by Maloney on June 2, 1979, which led Pihera to believe that they were going to carry on a business as partners. Among the statements were the following: On June 2, 1979, Maloney agreed to reimburse Pihera $8,000 for the expenses Pihera incurred in locating the property. Maloney also agreed to pay Pihera a "finder's fee" of $30,000 before Maloney would be allowed to enter the partnership. Beginning on June 2, 1979, Maloney was to pay one-half of all the expenses incurred by the parties on behalf of their business endeavor. At the inception of the partnership, therefore, Maloney bore the full cost of expenditures, crediting one-half of these amounts toward his $38,000 obligation.

The parties further agreed that Maloney would continue to operate his chiropractic office in Chicago, and Pihera would handle the property development. Maloney volunteered to pay Pihera $20 per

day to cover Pihera's expenses from June 2, 1979, until the time they were "open for business." Pihera explained that they "opened for business" on August 6, 1981, the date the Belcher property was purchased.

The parties agreed to purchase alternate parcels of property. A few weeks after their June 2, 1979, meeting they decided that after they purchased the parcels for the development, they would put them into a land trust. In order to equalize their investment in the partnership, they would contribute all four parcels, and the person who purchased the parcels of lesser value would reimburse the other for the difference. Pihera testified that even though he paid $16,000 for the Moak property at a distress sale, he and Maloney assigned the value of $44,000 to the property. The Ceretta parcel was assigned a value equal to its purchase price of $44,000. The Wesley Griffin property and Ballance property were assigned values equal to their respective purchase prices, $40,000 and $35,000. Although the land trust was never created, Pihera insists that the four parcels were included in the partnership.

Pihera testified that both he and Maloney filed individual assumed name affidavits under the name Fish and Feather Campground. Pihera contends that the Fish and Feather Campground partnership was in fact formed on June 2, 1979, even though the parties: never had a joint checking account; never had stationery printed designating their partnership; never utilized a reference to the partnership in any advertising; never jointly registered the Fish and Feather Campground as a partnership; and never retained an attorney for the purpose of formally preparing a partnership agreement.

With regard to the Belcher property boat dock, Pihera testified that he and Maloney each separately applied for a boat dock license with the Department of Conservation. Pihera did not know why the only signature on the application was his. He acknowledged that he was the only person to sign the application even though it provides that "if the bidder is a partnership both partners must sign."

Pihera's testimony regarding Lake Carlyle Development Company, Inc., parallels that of Maloney. Pihera testified that he and Maloney owned equal interests in the corporation. With the exception of a tree spade purchased by Maloney, both parties put in equal amounts of money to purchase the items of equipment that became the working tools of the corporation.

With regard to contributions made by Pihera on behalf of the partnership, Pihera testified that during 1979 he did not personally expend any money for partnership purposes because Maloney was to

contribute $38,000 to equalize the parties' investment in the creation of the partnership. In 1980 the parties purchased equipment, and Pihera paid one-half of the purchase price.

As to the Belcher property, Pihera confirmed that the cashier's check for $12,500 he produced at the closing of the property was funded to the extent of $12,000 by Maloney's money. Pihera contends that Maloney still had his initial monetary obligation to fulfill and, therefore, the $12,000 was simply credited to the amount Maloney owed. Pihera acknowledged that after the Belcher property was purchased and remodeling of the bait shop was completed, he spent very little time there. In fact, from 1982 until the time of trial, Pihera did nothing in and around the Belcher property. Pihera testified that from 1983 through 1987, he personally paid the yearly payments required on the Belcher property installment contract. These payments totalled $51,943. Pihera paid the taxes on the property for those years, totalling $3,892, and also paid closing costs of $792 and remodeling expenses of $6,255.

With regard to the Victor Griffin property, Pihera does not dispute that he and Maloney signed a nomineeship agreement. Pihera testified that at no time did he direct his attorney to prepare an assignment of the Victor Griffin property. Pihera eventually bought the property from the mortgagee for $50,000.

Pihera testified that for the years 1983 and 1984, he paid $856 in property taxes on the Wesley Griffin property because Maloney had allowed the tax payments to fall into arrears. In 1984 Maloney defaulted on the Wesley Griffin property loan. Subsequent to the foreclosure sale, Pihera purchased the property from the savings and loan.

As for income, from 1979 through 1980 there was farm crop rental income from the Moak, Ceretta, Griffin, and Ballance properties. The money received was split evenly between Maloney and Pihera. Pihera testified that the reason they split the proceeds was because they were to be partners on all properties under the partnership.

After the Belcher property was acquired, Maloney asked to lease the bait shop for one year. Contrary to Maloney's testimony, Pihera contends that they agreed that Maloney would pay $100 per month for the first six months of operation and $300 per month for the remaining six months of operation. Because Maloney paid only $500, Pihera argues that he is entitled to an award of $1,900. Pihera testified that his attorney represented both him and Maloney in preparing the lease. He also contends that Maloney owes him $5,874, which repre-

sents 11% on the stock at the bait shop calculated at $979 for six years.

## LARRY STOCK'S TESTIMONY

Larry Stock was called to testify by Maloney. He testified that he is a designer, builder, and contractor. He worked for both Maloney and Pihera in remodeling the bait shop and doing various construction projects. He and his crew did nothing without the consent of both Maloney and Pihera. Both Maloney and Pihera directed Stock as to what work was to be done at the bait shop. They also directed Stock to construct a fence on the Ceretta property.

## OPINION

■ A partnership is an association of two or more persons to carry on as co-owners a business for profit. (Ill. Rev. Stat. 1989, ch. 106½, par. 6.) The elements of a partnership are that the parties have joined together to carry on a trade or venture for their common benefit, with each contributing property or services to the enterprise, and with the parties having a community of interest in the profits. (*Peck v. Peck* (1959), 16 Ill. 2d 268, 280, 157 N.E.2d 249, 257.) The testimony of the parties in this case was markedly inconsistent as to whether a partnership was established. In such cases the trial court is in a superior position to make determinations on the credibility of the evidence, and only where the trial court's findings are against the manifest weight of the evidence will a reviewing court overturn the trial court's decision. *McCorkle v. Tyler Reporting Co.* (1987), 159 Ill. App. 3d 62, 68, 512 N.E.2d 25, 28.

■ In the absence of a written partnership agreement, we must ascertain the intent of the parties to determine whether a partnership was formed, and when making this determination, we must also examine the facts and circumstances surrounding the alleged formation of such an entity. (*McCorkle*, 159 Ill. App. 3d at 68, 512 N.E.2d at 29; *Olson v. Olson* (1965), 66 Ill. App. 2d 227, 213 N.E.2d 95.) In the instant case, we have carefully reviewed the evidence in the record and find that the court's determination that no partnership was formed is supported therein.

In *Olson v. Olson*, the court set forth some of the indicia of the existence of a partnership. While by no means exhaustive, we find them helpful in the instant case:

> "the manner in which the parties have dealt with each other; the mode in which each has, with the knowledge of the other, dealt with persons in a partnership capacity; whether they have

filed with the county clerk, a certificate setting forth the name of the partnership, in event the firm name does not include the true name of the persons transacting such partnership business [citation]; whether they have carried telephone listings and signs on trucks, etc., using the firm name; and whether they have shared the profits of the partnership." *Olson*, 66 Ill. App. 2d at 233, 213 N.E.2d at 98.

With these indicia in mind we note the following undisputed items of evidence. With the exception of the Belcher property, the parties purchased and held title to the parcels of property individually. The parties filed separate assumed name certificates. With the exception of an application to the Illinois Department of Conservation prepared by Maloney listing Pihera as a co-investor, neither party produced any documentary evidence showing that they held themselves out as partners. Although both Maloney and Pihera may have hired Bill Hahn to serve as manager of the Belcher property, Maloney testified that he personally paid Hahn's salary. The evidence shows that Hahn took orders from Maloney and did not follow directions from Pihera. Larry Stock and other witnesses who testified could not unequivocally state that they knew or were certain that the parties were partners.

■ Regarding profit sharing between Maloney and Pihera, the parties equally divided the trailer-rental proceeds on the Belcher property. This alone is an insufficient sharing of profits to establish a partnership because the parties purchased the Belcher property as tenants in common and the trailer-rental proceeds accrued prior to purchase were given to Maloney and Pihera as co-purchasers. Both the testimony of the parties and the documents admitted into evidence show that no profit was made as to the bait shop and campground operation on the Belcher property. The only income, the farm crop rental income generated on the Ceretta, Moak, and Wesley Griffin properties, was equally divided between the parties. The sharing of this nominal income alone is insufficient evidence that a partnership was created. Mere participation in the profits of a business does not create a partnership. *Schumann-Heink v. Folsom* (1927), 328 Ill. 321, 328, 159 N.E. 250, 253.

■ A partnership between two or more persons is a contractual relationship. There must be a meeting of minds of the parties to create a partnership. The intention of one party cannot create a partnership. (*Ramacciotti v. Simpkins* (1970), 130 Ill. App. 2d 733, 735, 266 N.E.2d 700, 702.) We find that there never was any agreement on several vital terms of the alleged partnership. For instance, no agreement was made as to the scope of the parties' duties both before and

after the purported partnership was formed, and no agreement was made as to the duration of the purported partnership. The absence of a meeting of the minds relating to such critical terms leads to the conclusion that the parties did not create a partnership. (*McCorkle*, 159 Ill. App. 3d at 69, 512 N.E.2d at 29.) In the instant case, there is no basis to overturn the court's finding that a partnership was not established. While the parties' intended goal *may* have been to form a partnership, we agree with the trial court that no partnership was established.

■ As for the issue of damages, Pihera first contends that the trial court erroneously assessed damages. Pihera argues that the court erred in not finding that a partnership was formed, and that the measure of damages should have been based upon a dissolution of the alleged partnership. We disagree. In this case there are no partnership accounts or expenses because no partnership was ever formed. See *Rankin v. Hojka* (1976), 42 Ill. App. 3d 440, 448, 355 N.E.2d 768, 774.

■ Pihera next argues that the court erred in allowing Maloney to amend his pleadings to allege unjust enrichment, and that an award of unjust enrichment was erroneous. Section 2—616(c) of the Code of Civil Procedure provides that "[a] pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just." (Ill. Rev. Stat. 1989, ch. 110, par. 2—616(c).) The trial court in this case, after initially denying Maloney's motion to amend because of a concern about timeliness, reversed its decision and assessed fees against Maloney in the amount of $200 to compensate for attorney fees expended with regard to the motion to amend. While recognizing that an amendment should not ordinarily be permitted to set up matters of which the pleader had full knowledge at the time of filing the original pleading, such an amendment will be allowed where justice is served by allowing leave to amend. (*Lawson v. Hill* (1979), 77 Ill. App. 3d 835, 845, 396 N.E.2d 617, 625.) After reviewing the record, we cannot say that the trial court abused its discretion in allowing Maloney leave to amend his complaint.

■ Pihera maintains that the evidence presented did not support a finding of unjust enrichment. Maloney cites *M.J. McCarthy Motor Sales Co. v. Van C. Argiris & Co.* (1979), 78 Ill. App. 3d 725, 396 N.E.2d 1253, in support of his argument that the trial court properly awarded him damages based on the theory of unjust enrichment. Pihera argues that because Maloney was not acting under a mistake of fact, as was the plaintiff in *McCarthy Motor Sales*, Maloney is not en-

titled to an award based on the theory of unjust enrichment. Pihera's argument is not well taken. It is not necessary that a plaintiff maintaining an action for unjust enrichment prove a mistake in fact. An action for money had and received is maintainable where defendant has received money which in equity and good conscience belongs to the plaintiff. *Drury v. County of McLean* (1982), 89 Ill. 2d 417, 425-426, 433 N.E.2d 666, 670; *Cohon v. Oscar L. Paris Co.* (1958), 17 Ill. App. 2d 21, 26, 149 N.E.2d 472, 475.

▪▪ Maloney is not asking to be reimbursed for the time and effort he expended, but he is asking to be reimbursed for the money that he paid for Pihera's benefit. Maloney agreed to pay all expenses in order to reach a level of parity with Pihera's contribution. When the partnership failed to come into fruition, Maloney was in the unenviable position of having made expenditures on property from which he could not benefit. As a result, Pihera received money for which in equity and good conscience Maloney should be reimbursed. We find, therefore, that the court did not err in awarding damages to Maloney for unjust enrichment.

▪▪▪ We now turn to the question of whether the calculation of damages under the theory of unjust enrichment was proper. The trial court awarded Maloney $27,067.63. This figure represents Maloney's expenditures on improvements to properties belonging to Pihera ($19,177.17) and one-half of the "general expenditures" Maloney made to which Pihera did not contribute ($7,890.46). The calculation of the unjust enrichment award is illustrated as follows:

Maloney's Expenditures:
Moak Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$1,336.10
Ceretta Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$5,268.26
Wesley Griffin Property. . . . . . . . . . . . . . . . . . . . . . . .$6,015.36
Other expenditures as to all three properties . . . . . .$6,557.45
Subtotal: $19,177.17
One-half of the general expenditures Maloney paid
to which Pihera did not contribute . . . . . . . . . . .$7,890.46
Subtotal: $7,890.46
Total: $27,067.63

The parties stipulated to the accuracy of the above figures as representing the expenditures made by Maloney as they appear in the ledger admitted into evidence. Under the circumstances of this case, Maloney's expenditure of money on the Moak and Ceretta properties unjustly enriched Pihera, and the trial court did not err in ordering Pihera to reimburse Maloney for those expenditures.

As for the money spent on the Wesley Griffin property, we must address the issue raised by Pihera of whether Maloney is entitled to recover for both unjust enrichment and breach of contract. It is true that a claim for unjust enrichment cannot stand where an express contractual agreement governs the relationship between the parties. (*Batler, Capitel & Schwartz v. Tapanes* (1987), 164 Ill. App. 3d 427, 430, 517 N.E.2d 1216, 1219.) However, this maxim does not apply here because the unjust enrichment claim is made as to the Wesley Griffin property, while the breach of contract claim is made as to the Victor Griffin property. We can find no rule of law which precludes a party from recovering under the theory of unjust enrichment as to one transaction, and recovering under a breach of contract theory as to another transaction. We conclude, therefore, that the trial court did not err in its assessment of damages awarded for unjust enrichment.

The next issue is whether the trial court erred in holding that Maloney's damage for breach of the Victor Griffin nomineeship agreement was $50,000, the value of the Wesley Griffin property lost to foreclosure. Maloney purchased the Victor Griffin property for $50,000 and entered into a nomineeship agreement which provided that Pihera would act as record owner of the property. Despite repeated requests, Pihera refused to assign the property to Maloney. Maloney testified that he was unable to make the mortgage payments on the Wesley Griffin property. He wanted to use the Victor Griffin property as collateral for a loan to protect the Wesley Griffin property from default. Maloney testified that because Pihera would not assign the Victor Griffin property, Maloney was unable to use the Victor Griffin property as collateral to forestall foreclosure on the Wesley Griffin property. The Wesley Griffin property was foreclosed upon, and Maloney lost the property to the bank. Pihera subsequently bought the Wesley Griffin property from the bank for $50,000.

Pihera argues that the measure of damages for breach of the nomineeship agreement should not be measured by the value of the Wesley Griffin property. He argues that Maloney's damages consist of the expenditures incurred by him in performing his obligations under the nomineeship agreement and any profit which he would have received as determined by the difference between the contract price for the property at the time the nomineeship agreement was entered into and the fair market value of the property at the time of the breach. Pihera cites no authority for this proposition.

A person breaching a contract can be held liable for such damages as may fairly and reasonably be considered as naturally arising from the breach thereof, in light of the facts known or which

should have been known or such as may reasonably be supposed to have been within the contemplation of the parties as a probable result of a breach thereof. (*Case Prestressing Corp. v. Chicago College of Osteopathic Medicine* (1983), 118 Ill. App. 3d 782, 788, 455 N.E.2d 811, 816.) In this case it was reasonably foreseeable that if Pihera failed to assign the Victor Griffin property pursuant to the nomineeship agreement, the Wesley Griffin property would go into foreclosure. Pihera's conduct caused a chain reaction which resulted in Maloney's loss of the Wesley Griffin property. When a contract is breached, the injured party is entitled to be placed in the position he would have been in had the contract been performed and is entitled to whatever net gain he would have made under the contract. (*Case Prestressing*, 118 Ill. App. 3d at 788, 455 N.E.2d at 816; *Rankin v. Hojka*, 42 Ill. App. 3d at 447, 355 N.E.2d at 773.) Had the trial court not awarded Maloney the value of the Wesley Griffin property as calculated from the amount received upon its sale, then Maloney would not have been put in the position he would have been in had the nomineeship agreement been fully performed. We find that the trial court's award of $50,000 as damages for Pihera's breach of the nomineeship agreement was not against the manifest weight of the evidence.

Turning to Maloney's cross-appeal, we are asked to determine whether the trial court erred in failing to credit Maloney for: (1) funding the down payment on the Belcher property; and (2) increasing the value of the Belcher property by his maintenance of a business presence from 1982 through 1987. In finding for Maloney on count III of his complaint, wherein Maloney requested that the court declare the parties' equitable interest in the real estate, the trial court ordered that the parties' interest as tenants in common be sold and that the net proceeds be equally divided, after Pihera was credited for the real estate taxes he paid in the amount of $3,892.

Pihera testified that he personally paid $51,943 in installment payments and $3,892 for real estate taxes on the Belcher property. Maloney testified that he paid an equal share of installment payments. The testimony of the parties was that Pihera expended $6,225 in remodeling costs and that Maloney expended $2,000 in improvements to the Belcher property. Comparing these figures, it appears that Pihera paid $8,117 more than Maloney: $3,892 for real estate taxes and $4,225 for improvements. If all remaining expenditures were equal, we believe that Pihera would be entitled to a credit of $8,117, because a cotenant who pays more than his share of a debt secured by a mortgage on the commonly owned property is entitled to reimbursement by contribution from his cotenants to the extent to

which he paid their share of the indebtedness. (*Olson v. Olson* (1965), 66 Ill. App. 2d 227, 235, 213 N.E.2d 95, 99.) However, we agree with Maloney that the trial court erred in not taking into consideration the $12,000 paid by Maloney as Pihera's share of the down payment. Pihera concedes that $12,000 of the $24,500 down payment paid by Maloney represented Pihera's share of the total down payment. In order to avoid Pihera's unjust enrichment at Maloney's expense, we find that Maloney is entitled to a $12,000 credit. Therefore, considering the $8,117 credit due Pihera and the $12,000 credit due Maloney, the judgment is modified to show that as to count III Maloney is entitled to a credit of $3,883, and the remaining net proceeds are then to be divided equally between the parties after the Belcher property is sold.

■■ As for Maloney's argument that he should receive credit for the increase in the value of the property by reason of his maintenance of a business presence thereon, no evidence was presented as to the measure of the purported increase in value. Counsel argues, nonetheless, that Maloney should receive $25,000 as an equitable sum. A party seeking to recover has the burden to establish not only that he sustained damages, but also to establish a reasonable basis for computing those damages. A court may not award damages based on speculation or conjecture. (*Beaton & Associates, Ltd. v. Joslyn Manufacturing & Supply Co.* (1987), 159 Ill. App. 3d 834, 845, 512 N.E.2d 1286, 1292.) We find that the trial court did not abuse its discretion in not awarding Maloney a credit for his maintenance of a business presence on the Belcher property.

Based on the foregoing, we modify the circuit court's amendment to judgment, substituting an *a* for the *b* designated in paragraph 2 of the amendment to judgment. (134 Ill. 2d R. 366.) With respect to count III of Maloney's complaint, we modify the circuit court's judgment to reflect that the parties are to divide the net proceeds of the sale of the Belcher property, after a credit of $3,883 is given to Maloney. We affirm the decision of the trial court in all other regards.

Affirmed as modified.

HOWERTON and LEWIS, JJ., concur.