CHERYL ARGIANAS, Special Adm'r of the Estate of Thomas Argianas, Deceased, Plaintiff and Counterdefendant-Appellant, v. JOEL CHESTLER, Defendant and Counterplaintiff-Appellee.

First District (5th Division)   No. 1—92—3486

Opinion filed March 31, 1994.

Robert S. Minetz, of Cowan & Minetz, Chartered, of Chicago, for appellant.

Loren J. Mallon and Stephen R. Chesler, both of Gottlieb & Schwartz, of Chicago, for appellee.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Thomas Argianas (Argianas), filed a verified complaint for dissolution of the partnership known as the V-31 account. Argianas asserted that a two-page handwritten document dated January 20, 1989, attached to the complaint, was a partnership agreement, which gave him a partnership interest in the V-31 account. Defendant, Joel Chestler (Chestler), filed a verified answer and counterclaim. Defendant's answer denied the material allegations of the complaint insofar as the plaintiff contended that the exhibit attached to the complaint was a partnership agreement. In addition, Chestler filed a counterclaim for alleged breach of an employment agreement. Defendant asserted that the same document which plaintiff contended was a partnership agreement was an employment agreement, which established plaintiff's compensation as a combination of salary plus commissions based on percentage of profits. Defendant alleged that on or about May 25, 1990, plaintiff's employment was terminated by

Chestler for cause when he discovered that plaintiff had been involved in trading violations.

On February 16, 1992, subsequent to the filing of the complaint, Thomas Argianas passed away. Plaintiff's wife, Cheryl Argianas, as special administrator of the estate of Thomas Argianas, was substituted as the plaintiff. Cheryl continued to prosecute the case in said capacity.

At a time when Judge Hall was the presiding trial court judge of this case, the parties filed cross-motions for summary judgment. Judge Hall denied said motions, finding that there were material issues of fact that required a trial. Subsequent to this ruling, Judge Braden presided over the remainder of the proceedings in this case. After trial, the court found in favor of the defendant and against the plaintiff.

Plaintiff presents the following issues for review: (1) whether the January 20, 1989, agreement signed by Thomas Argianas and Joel Chestler was a partnership agreement or an employment agreement; (2) whether the Dead Man's Act should have barred defendant's references to conversations with Thomas Argianas (see 735 ILCS 5/8—201 (West 1992)); and (3) whether the trial court erred in relying on the fact that the parties failed to register their agreement with the Midwest Stock Exchange (MSE).

Attached to the complaint were two documents, a handwritten agreement signed by Argianas and Chestler dated January 20, 1989, and a letter from Argianas to Chestler dated June 1, 1990. The January 20, 1989, agreement provides:

"1-20-89
This agreement is made between Joel Chestler and Thomas Argianas dated January 20th 1989. For the sum of fifteen thousand dollars (15,000.00) Thomas Argianas shall receive (40%) forty percent ownership in the stocks listed in the V31 account held by First Options of Chicago. Thomas C. Argianas will be listed as the registered co-specialist for these issues and he will be responsible for transactions made in these issues.
**** [24 issues specifically listed]
Thomas C. Argianas will also receive forty-percent ownership of any issues added to the above list that are held in the (V31) account.
Thomas C. Argianas will also receive forty-percent ownership of any issues added to the above list that are held in the (V31) account.
Thomas C. Argianas has no percentage of ownership or participation in the profits that are in the V30 account held by first options of Chicago. [sic] for C & A trading.

Thomas C. Argianas shall receive one-thousand five-hundred dollars (1500.00) per month as salary for the first six months of operation ending June 31, 1989. He will also receive (40%) forty-percent of the profits of the V31 account after expenses have been deducted.

If Thomas C. Argianas is unable to fill his responsibilities as co-specialist for more than 30 days his participation in the profits will be reduced to (20%) twenty-percent until he is able to continue upon which his participation will be (40%) forty percent.

J.C. [Joel Chestler]

T.A. [Thomas Argianas]"

The June 1, 1990, letter provides in relevant part:

"Dear Mr. Chestler:

Your recent conduct has left me with no choice but to terminate our V31 Account Partnership. Therefore, I have terminated this partnership effective immediately.

Pursuant to Ill. Rev. Stat., ch. 106, sec. 33, you are no longer authorized to act for the partnership 'except so far as may be necessary to wind up partnership affairs or to complete transactions begun but not ... finished.' "

The testimony at trial disclosed the following facts.

The plaintiff called Chestler as an adverse witness. Chestler testified that his occupation is a trader; however, in the past, he had been involved in various other types of businesses. Chestler had been a trader at the MSE for 10 years and on a day-to-day basis he makes markets on stats and trades paper that comes in from all over the country. He first met Argianas six to eight years ago. They started to work together in approximately 1987 and continued to work together on a daily basis from 1987 to about 1988 (except for a three- or four-month period when Argianas was in the hospital). Thereafter, Chestler terminated the partnership. Argianas worked for Chestler for approximately a year after that. The parties worked together again all of 1989 and until approximately 1990.

Chestler identified the agreement the parties signed on January 20, 1989, stating that Argianas had prepared the document. Although Chestler read the document before he signed it, he did not have an attorney review it at that time. The last paragraph of the document which had stated that the $15,000 would be deposited in C&A's account at First Options was stricken and initialed by both parties. The parties had mutually agreed to strike the paragraph. When asked if, for the sum of $15,000, Argianas was to receive a 40% ownership in the stocks listed in the account, Chestler replied:

"You are asking me a question that I really can't answer. You are

saying 40 percent ownership in the stocks? No one has ownership in the stocks."

Chestler stated that Argianas was to receive a commission. The V-31 account was owned. Chestler owned 24 accounts, of which the V-31 was a subaccount. Chestler stated that Argianas absolutely did not own part of the V-31 account.

Chestler identified a check for $15,000, the check that Argianas gave Chestler when they signed the January 20, 1989, agreement. Chestler had deposited the $15,000 in his personal account.

After January 20, 1989, Argianas worked for the V-31 account, while Chestler managed and supervised the V-31 account. The V-31 account is a group of particular stocks (those stocks listed on the agreement of January 20, 1989). Argianas worked on those stocks on a day-to-day basis from January 20, 1989, to his termination.

After January 20, 1989, and prior to Argianas' termination, the V-31 account was at First Options. If First Options clears a trader's trades, First Options guarantees the trades. Somewhere during the aforementioned time frame, Chestler moved all the accounts to Lakeside Bank and opened a clearing account. Chestler guaranteed all the accounts. At some point during this time frame the name of the account changed, and this was the reason for the name change. Since January 20, 1989, some of the stocks in the account have stopped trading and a few other stocks were added to the account.

First Options handled the money between Chestler and Argianas generated by the V-31 account. After January 20, 1989, Chestler possessed all the rights concerning the handling of the money and the distribution to himself and Argianas. Chestler decided if distributions should or should not occur; Argianas could not take distributions without Chestler's consent.

Chestler identified the June 1, 1990, letter, wherein Argianas purported to terminate the partnership. Chestler believes that after he received the letter, he called Argianas. Chestler did not make any attempt to sell the account or liquidate his right to deal with said group of stocks. After June 1, 1990, Argianas did not receive any benefit from that same group of stocks. Chestler claimed Argianas was demanding something that he did not have the right to do.

After Argianas was told not to return, Chestler hired a clerk and another trader (Jay Kaplan). Jay Kaplan received a salary. Ultimately there was a 75% to 25% split between Chestler and Kaplan with regard to this particular group of stocks. Kaplan did not have a written employment agreement.

Chestler did not direct the accountant to prepare a W-2 form for Argianas for 1989. Chestler did direct the accountants to prepare the

1099 form for Argianas for 1989 and 1990. The form indicates that the compensation received by Argianas both in 1989 and 1990 was "non-employee compensation." The compensation represented commissions relating to the stocks Argianas worked on.

When asked if he ever repaid the $15,000 to Argianas after he terminated him, Chestler replied he gave Argianas $9,000 back, he never gave back the entire $15,000.

In the nature of rehabilitative testimony, Chestler testified that the concept of "ownership" as he understood it in terms of the January 20, 1989, agreement was as follows:

> "C&A [Chestler & Argianas] is composed of three or four separate units, which is a set of stocks that each co-specialist has a right to trade. The competition in a company for the better stocks is so aggressive that co-specialists tend to feel an ownership of the stock. In other words, I have a right to trade IBM. You can't take it away from me and give it to a co-worker. IBM, you may be able to make a lot of money off it trading. In other words, what he was saying is: If I trade these stocks from the Midwest Stock Exchange—.
> 
> \*\*\*
> 
> Co-specialists become very possessive, and they feel as if they own the right to trade stock and don't want it given to somebody else. That's the concept of 'ownership' that I have."

To Chestler's knowledge and based on his experience it was not possible for Argianas, or himself, or anyone else, to actually own the stocks listed on the January 20, 1989, agreement. The statement in the agreement "Thomas C. Argianas will be listed as the registered co-specialist for these issues, and he will be responsible for transactions made in these issues" would mean that Argianas would be in charge of the particular group of stocks for the purpose of trading. Argianas received $1,500 per month and commissions. After deducting overhead and expenses, Argianas received 40% of the net profits per month as commission.

Regarding the fact that the $15,000 was paid to Chestler individually instead of C&A trading, Chestler testified that he had come to an agreement that the $15,000 was his and that he would reimburse Argianas $1,500 for six months. Due to troubles Argianas had in the past with the MSE, the balance was held in escrow for any future penalties that might have been incurred by Chestler for either lack of supervision or some discretionary thing that he did wrong. Chestler held the balance.

Prior to June 1, 1990, there was no communication between Argianas and himself about any partnership.

On redirect, Chestler testified that Argianas' 1099 forms for 1989 and 1990 were prepared after this lawsuit was filed.

Cheryl Argianas (Cheryl) testified that she had brought this action on behalf of the estate of Thomas Argianas. The estate consisted of Cheryl and her two daughters. Thomas Argianas died on February 16, 1991. Argianas went to college for about $3^1/2$ years, after which he started working for Chestler. He was an institutional broker for Mr. Tomasso and he continued to do brokerage work all of his life. Cheryl knew Chestler. After May 1990 C&A Trading did not send any of either the 40% profits or the 20% profits described in the agreement to Argianas at home.

On an offer of proof, Cheryl testified that Argianas told her the January 20, 1989, document was his partnership agreement with Chestler. She was told this numerous times.

The plaintiff rested.

Michael Cardin testified that he is the manager of the market regulation department at the MSE. He was in charge of the financial and operational compliance of the MSE's designated members. His job includes assisting the stock exchange in enforcing its rules and regulations with respect to financial and operational issues. He knew both Argianas and Chestler. The MSE keeps "permanent exam files" on companies and individuals that are registered. The file is a record of the member or the member organization, their structure, their financial wherewithal, and all the history of that member broker-dealer registered with the market regulation department.

A broker-dealer is registered with the SEC and is a member of an exchange or a self-regulatory organization, to trade securities and other kinds of securities under law. A broker-dealer could be both an individual and a company. A specialist at the MSE is a unit assigned stocks listed on the MSE and could be a company or an individual. The specialist is responsible for the trading of those. The term for the unit is specialist. The individual that trades the stock is called a co-specialist. The specialist that is assigned that particular stock or stocks is called the specialist unit. The terms are interchangeable.

The exchange maintains the permanent exam file for regulatory purposes. Cardin is one of the custodians of the permanent exam file of C&A Trading as well as Argianas Securities, Inc. (which includes the record with respect to Argianas).

Referring to the permanent exam file of C&A Trading, Cardin testified that an original broker-dealer application indicated that in 1987 the general partners for the entity known as C&A Trading were

Argianas Securities, Inc., and Chestler.[1] A proposed formal written partnership agreement accompanied the application.

Cardin testified that he was aware Chestler and Argianas had formed a trading partnership in 1987 under the name C&A Trading. The partners were Argianas Securities, Inc. (whose principal was Argianas) and Joel Chestler. Cardin learned that said partnership was terminated when the parties submitted documents to the MSE's regulations department that they were dissolving the partners in C&A Trading. Cardin identified a letter dated October 4, 1988, which indicated that the partnership interest was changing from Argianas having 50% and Chestler having 50% to Chestler having 95% and his wife, Lynn Chestler, having 5%. The letter further indicated that Argianas was changing from a partner to a clerk. The exchange approved the change of partnership ownership of C&A Trading.

Cardin testified that he did not have a record indicating that Argianas and Chestler had filed the appropriate form to register the alleged partnership formed January 20, 1989. Cardin testified that at one time Argianas owned a seat on the MSE and that on December 28, 1988, Argianas sold his seat for $40,000.

Joel Chestler was called to testify on behalf of the defense. Chestler testified that when he signed the January 20, 1989, agreement he had no intention of creating a partnership with Argianas, but rather his intention was to hire Argianas as a co-specialist. At the time Chestler was aware that Argianas was in ill health, but he did not know the severity of this illness. When the agreement was signed Chestler knew that Argianas did not have a great deal of money. Chestler was aware that Argianas was looking for a job, because Argianas had confronted several members of the exchange and then had approached Chestler seeking a job. The conversation Chestler was alluding to occurred approximately two weeks before the agreement was signed; Argianas came to him at the end of December, beginning of January.

On January 20, 1989, C&A Trading was a partnership between Chestler and his wife, Lynn. Chestler owned 95% and Lynn owned 5%. At that time Chestler understood Argianas' status with C&A Trading to be that of an employee, specifically a co-specialist in the V-31 account. The V-31 account was only one of three accounts Chestler had at that time at First Options. In January 1989 C&A Trading had either three or four employees.

All the co-specialists at C&A were compensated on a commission

---

[1]The trial court denied admission of the permanent exam file into evidence.

basis as a percent of net profit. Each co-specialist was compensated on a percentage of the book that they were responsible for (in this case the V-31 account) and that they traded.

Chestler identified a document drawn up by Argianas' lawyers when Argianas and he went into partnership July 14, 1987.[2] The purpose of the document was that the parties were entering into a partnership named C&A Trading. This partnership was registered with the MSE as a broker/dealer.

Chestler testified that the July 1987 partnership agreement was a written agreement. The parties also agreed in writing to terminate the partnership. In conjunction with the termination of the partnership, Chestler forgave Argianas' balance on two promissory notes. In addition, C&A Trading was in debt, and Chestler forgave Argianas C&A's indebtedness. Said indebtedness was approximately $12,000. In conjunction with the separation of Chestler and Argianas from C&A Trading, Chestler received the other 50% of C&A Trading and he remained responsible for paying off the balance of the debt.

During the existence of the 1987 partnership, there was a period of three to four months that Argianas was in the hospital and recuperating at home. At that time Argianas was compensated $3,000 to $5,000 a month. Chestler continued Argianas' compensation during that period of time because they were equal partners and although Argianas was supposed to be the working partner, Chestler felt a moral obligation to pay him.

After October 4, 1988, Chestler filed documents notifying the exchange that he and Argianas were no longer partners and that Chestler had formed the partnership with his wife. Chestler identified a document as an application for an amended broker/dealer registration. From his experience as a trader and his membership in the exchange, Chestler understood that he was under an obligation to file said document.

On January 25, 1990, Chestler's company became self-clearing. In conjunction with becoming self-clearing, Chestler set up a banking relationship with the Lakeside Bank. At the time, the general partners of C&A Trading were Chestler and his wife. During this same time, Argianas was working for the V-31 account under the terms of the January 20, 1989, agreement. Argianas did not have any signature rights over the bank account, nor had Argianas ever asked to be on that bank account. Chestler issued several checks to Argi-

---

[2]The trial court sustained an objection as to the admission of the partnership document; however, it allowed Chestler's testimony that the parties did enter into a partnership agreement to stand.

anas off that account. At the time of trial the account was still in existence and Chestler and his wife were the only individuals that could sign checks off the account.

On May 25, 1990, Chestler fired Argianas. Chestler asked Argianas if he had perpetrated trading violations for the previous five days. Argianas responded that he had. Chestler told Argianas he was fired, to clear his desk and leave. Argianas cleared his desk and left. Argianas never objected to Chestler's authority to terminate him. Thereafter, Chestler wrote a letter to Argianas confirming the actions that he had taken.

Chestler testified that he had not been formally notified that C&A Trading had been charged with any misconduct as a result of Argianas' activities in May 1990. However, Chestler did receive a phone call from the head of the legal department.

During closing argument plaintiff argued that the evidence clearly established that the agreement signed by the parties on January 20, 1989, established a partnership to sell certain stocks in the MSE. Plaintiff further argued the payment of $15,000 was inconsistent with an employment agreement; partners make partnership contributions, employees don't pay $15,000 to buy a job.

In closing, defendant maintained the agreement was not a partnership agreement. Defendant argued that this was not an isolated transaction, the history of the business relationship as it existed since 1987 could not be disregarded. Defendant noted that the first trial judge had already found that the agreement was ambiguous, and thus argued the prior course of dealings of the parties was relevant to determining what the parties intended when they signed the agreement. Defendant argued that although the agreement talks about ownership, there was testimony that ownership is a misnomer because the traders, the co-specialists, don't own the stock; rather, all they own is a right to trade the stocks. Further, defendant pointed to Cardin's testimony that in 1987 Argianas did the paper work to register C&A as a lawful broker/dealer partnership under the name C&A Trading and that when said partnership terminated, they reported the change to the exchange.

In ruling that the plaintiff had not sustained her burden of proof in showing that a partnership existed, the trial court considered the agreement, but noted that the agreement was not solely controlling in this case. The trial court stated that the other factors which must be taken into consideration in a determination as to the existence of a partnership include: the sharing of profits by the alleged partners, the mode in which the parties have dealt with each other, the use of the firm name and how they have related to one another, and the contribution of services.

Thereafter, plaintiff brought a motion to reconsider which the trial court subsequently denied. This timely appeal followed.

## I

Plaintiff argues that the trial court erred in holding that the agreement between Thomas Argianas and Joel Chestler was an employment agreement, not a partnership agreement. Plaintiff also notes that while the trial court's judgment constituted a holding that the parties' agreement was an employment agreement, there is no explanation in either the opinion rendered after trial or the opinion rendered after the motion to reconsider, of the basis for the court's finding that the agreement was an employment contract. For the reasons set forth below, we find that the language of the January 20, 1989, agreement did not unambiguously create either a partnership agreement or an employment agreement. The trial court specifically found that the plaintiff did not meet her burden of proof as to the existence of a partnership agreement and articulated several factors that had been considered. However, when the trial court found in favor of the defendant and against the plaintiff, the court did not articulate whether it was making a determination as to the existence of an employment agreement. Accordingly, while we affirm the decision of the trial court with regard to the plaintiff's claim of an alleged partnership, we remand the matter to the trial court with directions to clarify its ruling with regard to the defendant's counterclaim.

## A

First, plaintiff argues that the trial court misunderstood the facts and the plaintiff's claim. Plaintiff asserts that although the complaint clearly stated that the plaintiff claimed an interest in the V-31 account, nothing more, the trial judge erroneously believed the plaintiff was claiming an interest in all of the defendant's 24 accounts.

Plaintiff points to the following comments made by the trial court when issuing its ruling:

"[THE COURT:] *** The Court feels that the plaintiff has not proved that a partnership exists by the required evidence under the law.

Number one, in looking at the agreement there is nothing in the agreement that makes reference to a partnership here. Certainly, it calls for, and this is a troublesome area for the Court, but the Court feels as though it has resolved this matter in its decision to its satisfaction that there wasn't a partnership, the amount of money, $15,000 that was given by Mr. Argianas, but

the Court, in that agreement the entire focus of that agreement was on that account, the V-31 account, and at most the Court feels as though that ownership interest is in that account as far as the forty percent is concerned, and not in the partnership.

MR. MINETZ: We are only asking for ownership interest in that account. That's all we're asking for, nothing else. That is the partnership account.

THE COURT: Is that the only account?

MR. MINETZ: Yes, on the V-31 account.

\*\*\*

MR. MINETZ: C&A Trading is a separate partnership. He and his wife are partners in C&A Trading. We are only partners in this one V-31 account.

THE COURT: Is that the entire asset?

MR. MINETZ: Yes. The entire asset we want an accounting for. That is the entire asset we want a liquidation of. He says he has many accounts. We are a partner in only one account, Judge. That's all we've ever asked for.

\*\*\*

He has other accounts with other partners, with other people.

THE COURT: But the totality of all of these other accounts, that is a part of the partnership.

MR. MINETZ: No. We never said that. We have proven we were partners in one account, the V-31 account. That's all we have asked for. He can have two hundred other accounts. We don't care.

THE COURT: But these other accounts, is that a part of the partnership asset?

MR. MINETZ: No. Our partnership under that document is the V-31 account. That's what it says. We bought an interest in only that one little account, Judge, and that's all that we want liquidated.

\*\*\*

MR. MALLON: The V-31 account was one of several accounts, which together compromised the assets of C&A Trading.

THE COURT: Now, wait a minute, That is what I understood as far as the facts from the trial.

MR. MALLON: Correct, Judge.

MR. MINETZ: It is only one of many C&A accounts, but we have never claimed to be a partner in C&A.

THE COURT: But that is just a part of the totality of the partnership assets.

MR. MINETZ: Not our partnership. We have a partnership for the V-31 account.

THE COURT: All right. Okay. Let me just say this, counsel, I

take it that this partnership is a total pie with several pieces, the pieces being several accounts. That is what I got from the facts of the trial.

MR. MINETZ: Not our partnership. Our partnership talks about one account.

THE COURT: I am telling you what I found the fact to be from the trial that occurred before me, and I am trying to simplify this in a simple language to compare it to a total pie of several pieces, the several pieces being several accounts.

And I am saying that you can't say I agree that there was an agreement that there was an ownership interest in one of those pieces, which was the V-31 account.

There are several accounts here, but you can't assert an interest in the partnership by agreeing to an interest in one of the pieces, which was the V-31 account.

Okay, Now, another factor that the Court took into consideration was that there was a bank account that represented the assets of the total pie, the partnership, and that the bank account was in the names of Mr. Chestler and his wife as partners.

Another factor was the custom in the business as far as registering this on the exchange. It was registered as a partnership in the names of Mr. Chestler and his wife.

Now, all of these are factors that the Court took into consideration that didn't comply with what is required by the law as far as Mr. Argianas establishing a partnership interest in the partnership."

Considering the aforementioned comments by the trial court standing alone, we might agree with the plaintiff's argument. However, we must consider the totality of the actions of the trial court. In ruling on plaintiff's motion to reconsider, the trial court made the following statements:

"I was really a little confused, Mr. Minetz, in reading your complaint, you know, as to what you were asking for as far as the partnership interest.

I understand it now, you know.

\*\*\*

It wasn't clear. And, then, when you brought it to my attention I read it again and then I could see that when you read the agreement, along with the general way in which you drafted the complaint that, you know, it was there. But it was some thing that, in my opinion, you really didn't heavily focus on, not only in drafting the complaint but also in trying the case, you know. I mean, that's my opinion.

But looking at it in the light in which you are presenting it to me now, and that is what you're asking for, is asserting, asking

the Court to find that there was a partnership interest in this one account.

MR. MINETZ: Correct.

THE COURT: The V-31 account, as labeled. I think that you— it's the Court's opinion that you were short on your proof as required by the law. And the burden's on you. And now, you know, of course, you never know why things are done. But at the outset you knew that *** Mr. Argianas, had a short life span. You stated that in your complaint. ***

And the Court wonders, just as Mr. Mallon mentioned, why was there no [*sic*] in evidence that position taken whereby he could, we could get his version of this. But for whatever reason, it wasn't taken. But I think that, that deposition might have clarified some things as far as the plaintiff's position is concerned here on this as far as asserting and as far as bolstering the evidence and meeting their burden to show that this was a, this was a partnership.

And even now that I clearly understand what you're asking me to do, I still think that my ruling is the same. And for that reason, I'm going to deny your motion to reconsider."

■ We believe the trial court's comments when ruling on the motion to reconsider indicate that although it was initially slightly confused, the court ultimately understood completely the nature of the issues in the present case.

### B

Second, plaintiff argues that the trial court erred in failing to hold that the agreement was an unambiguous partnership agreement and maintains that the words of the document signed on January 20, 1989, establish a partnership, not an employment agreement.

Due to the fact that a partnership is a contractual relationship, the principles of contract law apply fully to it. (*In re Estate of Johnson* (1984), 129 Ill. App. 3d 22, 472 N.E.2d 72.) Where the language of the parties is unambiguous, the intent must be ascertained solely from the language of the agreement; extrinsic evidence may be considered only where the terms are ambiguous. (*Borys v. Rudd* (1990), 207 Ill. App. 3d 610, 616, 566 N.E.2d 310, 314.) The determination as to whether a contract is ambiguous is a question of law to be determined by the court. (*Borys*, 207 Ill. App. 3d at 617, 566 N.E.2d at 314.) Where the contract terms are clear and unambiguous, the meaning of the contract at issue must be determined from the words or language used, and a court cannot place a construction on the contract which is contrary to the plain and obvious meaning of the language. *Koester v. Weber, Cohen & Riley, Inc.* (1989), 193 Ill. App. 3d 1045, 1049, 550 N.E.2d 1004, 1005.

■ An examination of the January 20, 1989, agreement does not on its face indicate a partnership. The agreement does provide that for $15,000, Argianas would receive 40% "ownership" in the stocks listed in the V-31 account (unless Argianas was unable to fulfill his responsibilities for more than 30 days in which case the profits would be reduced to 20%). The agreement also provided that Argianas was to receive a salary, yet does not indicate, who, if anyone is his employer. The employer could be Chestler or C&A Trading. The agreement mentions nothing about Chestler's duties with respect to an alleged partnership and nowhere in the agreement are the parties identified as partners. There is no indication as to the duration of the purported partnership.

Although a sharing of profits is an essential test in determining the existence of a partnership, mere participation in profits does not alone create a partnership. (*Rizzo v. Rizzo* (1954), 3 Ill. 2d 291, 300, 120 N.E.2d 546.) We agree with the trial court that the language in the January 20, 1989, agreement is ambiguous. We find that it does not unambiguously create either a partnership or an employment agreement. Accordingly, the trial court properly held an evidentiary hearing to determine whether or not a partnership existed.

## C

Third, plaintiff argues that even if this court finds the agreement ambiguous, the judgment should still be reversed because the overwhelming evidence established a partnership, not an employment agreement.

Plaintiff argues that defendant's contention that Argianas paid $15,000 to secure employment does not make sense. Plaintiff further points to the fact that the 1099 forms prepared by the defendant's accountant state that the amounts paid to Argianas in 1989 and 1990 were "non-employee compensation."

Defendant argues evidence in the record supports a conclusion that Argianas was an employee of C&A Trading. Defendant asserts that the agreement itself does not describe the $15,000 as a capital contribution, nor was evidence presented to support an inference that the money was put up as capital by Argianas. Further, the record contains testimony that Chestler had previously paid fines on behalf of Argianas. Thus, defendant argues that when Chestler testified that part of the $15,000 was taken in as a security deposit to protect C&A Trading in the event there were future fines levied against it based on Argianas' conduct, the testimony was not inherently incredible. In addition, a part of the agreement provided for Argianas to receive, as compensation, a salary for the first six

months, as well as 40% of the profits of the V-31 account. Chestler testified that co-specialists are typically compensated on a percentage-of-profits basis. Finally, the 1099 form itself is labeled "miscellaneous income."

■ The burden of proving that a partnership exists rests on the party asserting it. (*Seidmon v. Harris* (1988), 172 Ill. App. 3d 352, 357, 526 N.E.2d 543, 546.) A partnership between two or more persons is a contractual relationship and therefore there must be a meeting of minds of the parties to create a partnership. (*Maloney v. Pihera* (1991), 215 Ill. App. 3d 30, 43, 573 N.E.2d 1379.) Whether a partnership exists is a question to be determined by the fact finder from all the facts and circumstances presented. (*Estes v. Maddrell* (1991), 208 Ill. App. 3d 813, 818, 566 N.E.2d 916, 919.)

> "The requisites of a partnership are that the parties must have joined together to carry on a trade or venture for their common benefit, each contributing property or services, and having a community of interest in the profits. As between the parties, the existence of a partnership is a question of intent, based on all of the facts and circumstances." (*Seidmon v. Harris* (1988), 172 Ill. App. 3d 352, 357, 526 N.E.2d 543, 545-46, citing *Rizzo v. Rizzo* (1954), 3 Ill. 2d 291, 299, 120 N.E.2d 546, 551; *Olson v. Olson* (1965), 66 Ill. App. 2d 227, 233, 213 N.E.2d 95, 97-98.)

In determining the existence of a partnership, the following factors are material: the manner in which the parties have dealt with each other; the mode in which each has, with the knowledge of the other, dealt with persons in a partnership capacity; whether the alleged partnership has advertised using the firm name; and whether the alleged partners shared the profits. (*Seidmon v. Harris* (1988), 172 Ill. App. 3d 352, 357, 526 N.E.2d 543, 546.) However, mere participation in profits does not alone create a partnership. (*Rizzo v. Rizzo* (1954), 3 Ill. 2d 291, 300, 120 N.E.2d 546.) The question of whether the parties intended that an agreement or arrangement constitutes a partnership must be determined from the language and conduct of the parties and from all the facts and circumstances surrounding the transaction. *Olson v. Olson* (1965), 66 Ill. App. 2d 227, 233, 213 N.E.2d 95.

The testimony of the parties and documentary evidence in this case was inconsistent as to whether a partnership was established. Under such circumstances, the trial court is in the best position to make determinations on the credibility of the evidence, and only where the trial court's findings are against the manifest weight of the evidence will a reviewing court overturn the trial court's decision. *Maloney v. Pihera* (1991), 215 Ill. App. 3d 30, 42, 573 N.E.2d 1379.

■ The evidence introduced at the hearing does not clearly resolve the question of the true relationship between Argianas and Chestler. The June 1, 1990, letter from Argianas to Chestler indicates that Argianas wanted to terminate a partnership, effective immediately. Less than one month later, Chestler sent Argianas a letter labeled "Notice of Termination." This letter refers to an investigation pertaining to Nationwide Health Properties, Inc., stock and the fact that on May 25, 1990, Argianas admitted trading violations. The letter indicates that Argianas' employment with C&A was effectively terminated May 25, 1990.

Despite the fact that the word "ownership" is used in the agreement, Chestler testified that Argianas did not own part of the V-31 account and that "[n]o one has ownership in the stocks." The account was a trading account at a clearing house, which, if traded right, made money. In describing his concept of "ownership," Chestler stated that co-specialists become very possessive and feel as if they "own" the right to trade the stock.

The written agreement indicated Argianas was to be registered as a co-specialist for the stocks listed in the V-31 account and be responsible for transactions made. Chestler testified that he managed and supervised the V-31 account. After January 20, 1989, Chestler possessed all the rights concerning the handling of the money and the distribution to himself and Argianas. Chestler testified that he decided if distributions should or should not occur; Argianas could not take distributions without Chestler's consent. Argianas did not have any signature rights on the account at Lakeside Bank.

The agreement provided that Argianas was to receive a salary for six months. No withholding taxes or unemployment compensation was deducted from any money Argianas received from Chestler. Chestler's testimony indicates that it was Argianas who wanted a "gross check" and to be treated as a subcontractor. In addition, testimony indicated that the parties had formed a partnership in the past and that at that time the parties had followed steps to register the partnership with the MSE. The parties also notified the MSE of the dissolution of said partnership. The parties did not follow the same steps with regard to the January 20, 1989, agreement.

The trial court set forth several factors properly considered in determining the existence of a partnership. In ruling that the plaintiff had not sustained her burden of proof in showing that a partnership existed, the trial court considered the agreement but noted that the agreement was not solely controlling in this case. The trial court stated that the other factors which must be taken into consideration in a determination as to the existence of a partnership

include: the sharing of profits by the alleged partners, the mode in which the parties have dealt with each other, the use of the firm name and how they have related to one another, and the contribution of services. We find that the trial court did not err in determining that a partnership did not exist.

## II

Plaintiff argues that the Dead Man's Act should have barred defendant's references to conversations with Argianas.

The Dead Man's Act provides in relevant part:

> "In the trial of any action in which any party sues or defends as the representative of a deceased person or a person under a legal disability, no adverse party or person in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased \*\*\* or to any event which took place in the presence of the deceased \*\*\*, except in the following instances:
>
> (a) If any person testifies on behalf of the representative to any conversation with the deceased \*\*\* or to any event which took place in the presence of the deceased \*\*\*, any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event." 735 ILCS 5/8—201 (West 1992).

Plaintiff argues that the trial court allowed Chestler to testify to his conversation with Argianas when he terminated him. The relevant portion of the transcript indicates defense counsel asked Chestler what transpired on May 25, 1990, that led to his decision to terminate Argianas. When defense counsel asked if Chestler could explain the circumstances under which Argianas was terminated, plaintiff objected. Plaintiff argued that if the agreement was an employment agreement, Chestler had the absolute right to terminate Argianas, if it was a partnership agreement it didn't matter. Defense counsel argued he believed the evidence would show that Argianas basically accepted the direction and left and that said conduct is inconsistent with the conduct of a partner. The trial court overruled the objection. Chestler then testified that a conversation took place in the work area where Argianas traded the V-31 account on the floor of the exchange. Chestler, Argianas and a floor representative of market regulation were present. Chestler stated:

> "A. \*\*\* I asked him directly if he has perpetrated these trading violations for the last five days.
>
> Q. [Defense counsel] And what, if anything, did Mr. Argianas say back to you?
>
> A. He said, 'Yes, I have.' "

Chestler then testified that he told Argianas he was fired and Argianas cleared out his desk and left. Argianas did not object to his authority to terminate him.

In addition, Chestler testified to the following:

"Q. What communications, if any, Mr. Chestler, did you have from Mr. Argianas prior to June 1st, 1990, that he viewed himself as a partner?

***

A. No. There was no communication between Mr. Argianas and myself about any partnership."

Plaintiff maintains the aforementioned testimony constitutes reversible error.

Prior to the above testimony, the plaintiff made an objection as to what Argianas said as barred by the Dead Man's Act. Defendant argued when plaintiff introduced the June 1, 1990, letter into evidence, Argianas was in effect testifying through the letter and that under case law, once plaintiff opened the door, the defense was allowed to go into it. The trial court sustained the objection. Thereafter, defendant asked to make an offer of proof and argued that *Hartman v. Townsend* (1988), 169 Ill. App. 3d 111, 523 N.E.2d 199, applied to the present case. Thereafter, the trial court reconsidered its ruling and overruled the objection.

Plaintiff argued that the facts in *Hartman* had nothing to do with the present case, because in *Hartman* they didn't try to get a conversation into evidence, they tried to get an event into evidence. The trial court stated:

"Well, the letter is being offered for the truth of the content that's contained therein. In effect, it is a letter which is offered for the purpose of speaking for the decedent, that he had a partnership, that he was a partner in the partnership in question.

If he were on the stand testifying to that, certainly the question put by counsel would be a fair one, a fair question to rebut that. That's what counsel is trying to do here. The whole purpose of the act is to put the parties on equal footing."

Defendant asserts his testimony was clearly proper under *Hartman*, and that plaintiff "opened the door" to allowing Chestler's testimony, because the plaintiff attempted to prove that a partnership in the V-31 account existed between Argianas and Chestler by reference in particular to exhibits, plus the testimony of Cheryl and the adverse testimony of Chestler. Defendant maintains that once the plaintiff "opened the door" by trying to prove the January 20, 1989, document was a partnership agreement, the trial court correctly allowed Chestler to testify with respect to his intention in signing the January 20, 1989, document along with additional facts concerning the prior business relationship between the parties, starting with the July 1987 formal partnership.

In *Hoem v. Zia* (1994), 159 Ill. 2d 193, the Illinois Supreme Court

held that the plaintiff waived application of the Dead Man's Act by bringing into evidence a defendant physician's notes concerning a meeting with a deceased patient. The plaintiff presented expert testimony of Dr. Fintel, who testified in part based upon the information that defendant Dr. Zia recorded in his notes. Over plaintiff's Dead Man's Act objections, Dr. Zia testified concerning his examination of Hoem. Dr. Zia testified to symptoms Hoem described to him during the examination. The appellate court reversed and remanded the case, finding that the trial court erred in allowing Dr. Zia to testify to what Hoem told him during Hoem's visit because such testimony violated the Dead Man's Act. The supreme court disagreed with the appellate court and found that the testimony of Dr. Fintel and the introduction of Dr. Zia's office notes opened the door to Dr. Zia's testimony.

The supreme court noted that from Dr. Fintel's statements, it might be argued that Dr. Fintel was merely interpreting the note. The court found that he was, however, doing more than that in that rather than merely translating Dr. Zia's note for the benefit of the jury, Dr. Fintel had put his gloss on the notes. Taking Dr. Fintel's statements together, the court noted he was clearly insinuating that Hoem visited Dr. Zia specifically for the treatment of a heart-related problem. Under the facts, the court found Dr. Fintel's testimony fell within subsection (a) of the Act (735 ILCS 5/8—201(a) (West 1992)) and that plaintiff waived the bar of the Dead Man's Act. (*Hoem*, 159 Ill. 2d at 201.) The court stated:

> "The purpose of the Dead-Man's Act is to remove the temptation of the survivor to a transaction to testify falsely and to equalize the positions of the parties in regard to the giving of testimony. [Citation.] In this case, allowing the representative of the deceased to introduce her version of why Hoem went to Dr. Zia, without giving an equal opportunity to Dr. Zia, would not advance the policy behind the Act. Under these circumstances, we find it fundamentally unfair to deny Dr. Zia an opportunity to explain his view of what happened. Left unchallenged, Dr. Fintel's comments would have remained with the jury as the only testimony regarding the conversation between Dr. Zia and Hoem." *Hoem*, 159 Ill. 2d at 201-02.

We believe that *Hoem* is also distinguishable from the present case.

■ Chestler attempts to describe the conversations as events; however, he clearly testified to conversations. Chestler argues that by plaintiff's introducing the June 1, 1990, letter, the door was opened to allow testimony of past conversations with Argianas that indicated

the letter was false. We do not believe that the letter in and of itself opened the door to testimony regarding conversations with the deceased. We believe the trial court erred in allowing Chestler's testimony about conversations with Argianas as to whether a partnership existed.

Although we find that the trial court erred in allowing testimony in contravention of the Dead Man's Act, we find that the error was harmless in the present case. A party is not entitled to a reversal based on a ruling on evidence unless the error was substantially prejudicial and affected the outcome of the trial. (*Jackson v. Pellerano* (1991), 210 Ill. App. 3d 464, 471, 569 N.E.2d 167.) Where it appears an error did not affect the outcome of trial, or where the reviewing court can see from the entire record, the judgment will not be disturbed. (*Jackson*, 210 Ill. App. 3d at 471.) The burden rests with the party seeking reversal to establish prejudice. (*Jackson*, 210 Ill. App. 3d at 471.) After a review of the record, we do not believe the testimony at issue was substantially prejudicial or affected the outcome of the trial.

### III

Finally, plaintiff contends that the trial court's reliance on the failure of the parties to register their agreement with the MSE was error. When rendering its oral opinion, the trial court noted that one of the reasons for its decision was the failure of either of the parties to register their agreement with the MSE as required by its rules. Plaintiff argues that defendant's contention that the agreement violated the rules of the MSE was an affirmative defense and as such defendant was required to plead said rules.

Section 2—613 of the Illinois Code of Civil Procedure states in relevant part:

> "(d) The facts constituting any affirmative defense, such as *** illegality, *** that an instrument or transaction is either void or voidable in point of law, *** and any defense which by other affirmative matter seeks to avoid the legal effect of or defeat the cause of action set forth in the complaint, counterclaim, or third-party complaint, in whole or in part, and any ground or defense, whether affirmative or not, which, if not expressly stated in the pleading, would be likely to take the opposite party by surprise, must be plainly set forth in the answer or reply." 735 ILCS 5/2—613 (West 1992).

Plaintiff maintains that it was reversible error for the trial court to dismiss this case based on an affirmative defense which the defendant failed to plead and cites *Handleman v. London Time, Ltd.* (1984), 124 Ill. App. 3d 318, 464 N.E.2d 710, in support of her position. In

*Handleman*, the plaintiffs failed to allege or prove any agency relationship to the beneficial owners of the subject premises. The court found that since the lack of authority of an agent to execute a lease is an affirmative defense, it necessarily follows that defendant had the burden of pleading and proving plaintiffs' lack of authority. (*Handleman*, 124 Ill. App. 3d 318, 464 N.E.2d 710.) The court found that the purpose of section 2—613 is to specify the disputed legal issues before trial and that the parties are to be informed of the legal theories which will be presented by their respective opponents. (*Handleman*, 124 Ill. App. 3d 318, 464 N.E.2d 710.) We find *Handleman* factually distinguishable from the present case.

■ Defendant argues that while it may be that as a matter of law the parties' failure to register the January 1989 agreement with the market regulation department of the MSE might have been pleaded as an affirmative defense, in this case the testimonial evidence of the parties' failure to register the January 20, 1989, agreement was introduced as evidence that the parties did not view the document as a partnership agreement. In addition, in light of Michael Cardin's testimony with regard to the requirement that partnership agreements be registered with the market regulation department of the MSE, the trial court could properly receive as evidence of the parties' state of mind as to whether they intended to enter into a partnership agreement evidence that the alleged agreement was not registered with the exchange. Moreover, defendant argues that this was only part of the evidence upon which the trial court based its decision and that there was ample additional evidence to support the trial judge's conclusions and finding that the plaintiff had failed to sustain her burden of proof on the issue of whether the January 20, 1989, agreement was in fact a partnership agreement.

We agree with defendant's argument. The testimony was relevant to indicate the parties' prior course of conduct.

Finally, plaintiff argues the trial court's reliance on the alleged exchange rules was erroneous because there is no precedent for the proposition that the failure to register the agreement makes it unenforceable between the parties. Contrary to plaintiff's assertion, the trial court did not hold that the failure to register the agreement made the agreement unenforceable between the parties; rather, the trial court considered the evidence as but one factor in determining whether a partnership agreement existed.

We note we must agree with the comments of the trial court that perhaps the facts of the case would have been clearer had the plaintiff taken an evidence deposition of Argianas (since the plaintiff was aware of his failing health and pled the same in the complaint). In

addition, neither side offered expert testimony. It seems clear that the parties understood many of the unique meanings attached to ordinary words used at the MSE; however, that does not mean the same is necessarily true for a fact finder or this court. Expert testimony might have helped clarify meanings. Nevertheless, hindsight is 20/20 vision, and the time for evidence is well past. As we must, the decision of this court is based entirely on the record that was presented to us.

■ Accordingly, for all the reasons set forth above, we affirm the decision of the trial court with respect to the plaintiff's claim, yet we remand the matter to the trial court with directions to clarify its ruling with regard to defendant's counterclaim.

After oral argument in his case, Chestler filed a motion to supplement the record with an affidavit as to what happened to the $15,000 paid by Argianas to Chestler at the onset of the transaction involved. On February 8, 1994, we allowed the motion. However, on March 1, 1994, Argianas filed a motion to reconsider the order of February 8, 1994, which we took with the case. In light of our action in this appeal, we grant Argianas' motion to reconsider and vacate the February 8, 1994, order. We remand the matter of the disposition of the $15,000 to the trial court for resolution.

Affirmed in part; remanded with directions in part.

McNULTY and COUSINS, JJ., concur.