NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190809-U

NO. 4-19-0809

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 25, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| LAURA ANN CORY, | ) | Appeal from the |
|     Plaintiff and Counterdefendant-Appellee, | ) | Circuit Court of |
|     v. | ) | Jersey County |
| DOUGLAS EDWARD HUNT and CNB BANK & | ) | No. 12CH63 |
| TRUST, N.A., | ) | |
|     Defendants | ) | Honorable |
| (Douglas Edward Hunt, Defendant and Counterplaintiff- | ) | Eric S. Pistorius, |
| Appellant). | ) | Judge Presiding. |

_____

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's finding the defendant failed to meet his burden of proof was not
against the manifest weight of the evidence.

¶ 2    In 2016, defendant, Douglas Hunt, filed a second amended counterclaim to an

action initiated by plaintiff, Laura Cory, claiming breach of an oral partnership related to

plaintiff's hog operation. After a bench trial, the trial court held defendant failed to meet his

burden of proof as to the existence of the oral partnership. Defendant appeals, and we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    In August 2012, after an irretrievable breakdown of the personal relationship

between defendant and plaintiff, plaintiff filed a complaint against defendant for the dissolution

of two partnerships, Greene Deere and Hunt Family Farms. The Hunt Family Farms partnership

was formed in 2002 and the Greene Deere partnership was formed in 2009. Both partnerships were formed under oral partnership agreements, whereby plaintiff loaned her name, credit, and real property as additional security for various partnership loans and refinancing arrangements. In January 2013, plaintiff filed a first amended complaint, which included the two original actions for dissolution of the Greene Deere and Hunt Family Farms partnerships, as well as two claims defendant breached oral agreements for payments of debts related to the Greene Deere and Hunt Family Farms partnerships, respectively. In April 2013, plaintiff filed a motion for partial summary judgment, asking the trial court to enter judgments dissolving the Greene Deere and Hunt Family Farms partnerships. An agreed order dissolving the partnerships was entered on April 4, 2013. Neither of these partnerships are involved in this appeal.

¶ 5                                    A. Counterclaims

¶ 6          In May 2013, defendant filed a counterclaim for *quantum meruit* related to plaintiff's hog farm. Defendant alleged in 2000, plaintiff and defendant entered into "an oral agreement whereby [defendant] would provide the labor, farming equipment, trucks, tractors, tools, and services required to raise and market the hogs." Defendant alleged, per the agreement, he would be "compensated for the labor, services, and use of equipment incurred on behalf of [plaintiff's] hog operation." Defendant alleged 10 years of labor and services.

¶ 7          Plaintiff denied defendant's claim and alleged affirmative defenses of failure to state a cause of action upon which relief may be granted, the doctrines of *laches*, estoppel, and unclean hands, and statute of limitations.

¶ 8          On August 6, 2015, plaintiff filed a motion to dismiss defendant's counterclaim under the Frauds Act (740 ILCS 80/1 *et seq.* (West 2014)), arguing defendant was asserting an oral contract that could not be completed within one year.

¶ 9        On October 15, 2015, defendant, represented by new counsel, filed a first amended counterclaim. Defendant alleged, in relevant part, a breach of a "hog partnership agreement" he and plaintiff had formed as an oral partnership in 2000 as to plaintiff's hog operation.

¶ 10        On November 20, 2015, plaintiff filed a combined motion to dismiss counterclaim, alleging the claims as to a hog partnership were time barred by the statute of limitations. The trial court dismissed the hog partnership claim without prejudice.

¶ 11        On January 6, 2016, defendant filed a second amended counterclaim, again alleging, in relevant part, a breach of a "hog partnership" formed in 2000 between defendant and plaintiff as to plaintiff's hog operation. In his claim, defendant alleged a plan was formed to create a hog partnership during plaintiff's bankruptcy proceedings in 2000 and the partnership was based on "multiple conversations between the two of them, yet it was never reduced to writing in a formal partnership agreement." Defendant alleged in exchange for a 50% interest in the hog partnership, he would manage the day-to-day operations of the hog farm.

¶ 12        On February 5, 2016, plaintiff filed a combined motion to dismiss, arguing, in relevant part, the interest in real estate claimed was against the Statute of Frauds. On April 12, 2016, the trial court denied the motion to dismiss, finding "the agreement does not directly involve the real estate but only peripherally."

¶ 13        On June 17, 2016, plaintiff filed an answer to defendant's second amended counterclaim, denying the existence of the hog partnership.

¶ 14                                B. Bench Trial

¶ 15                                1. *Defendant's Case*

- 3 -

¶ 16          On January 2, 2020, the matter proceeded to a bench trial. Defendant testified he had known plaintiff since high school and had helped out on her and her husband's hog farm in the past. In 1999, after plaintiff filed for divorce, she disclosed to defendant she was having financial troubles and plaintiff's husband no longer wished to be involved with the farm. Defendant suggested she file for bankruptcy. Defendant testified he discussed with his family a plan to help save plaintiff's farm, which involved defendant managing the day-to-day operations of the hog farm. Defendant testified on an evening in 1999, he had a discussion with an "upset" plaintiff:

> "I told her that *** I spoke to my parents and my brother and we had an option for her if she wanted to use it we proposed a *** 50/50 *** partnership on the hogs and the grain operation *** simple as that and *** she agreed and then where the farm was concerned we[,] my dad and me[,] neither one of us wanted to attach to it in any way in liens anything like that. Just a simple agreement that if we made it and we got any *** any value in the farm then we would split 50/50 at the time we decided we no longer wanted to operate together."

Defendant stated the agreement was never in writing because all his farming deals had been oral partnerships and he "didn't want to do anything that would jeopardize [plaintiff's] bankruptcy."

¶ 17          Defendant testified while he was managing the hog operation, plaintiff was working 12-hour shifts, working seven shifts every 14-day period. Plaintiff's son, who was 11 or 12 years old in 2000, would help with the farm work. Defendant's brother would perform maintenance every evening after work, but he was only paid "[i]n a few few times. Mainly any checks written to him was reimbursement for supplies and parts that he got on the way to come up to fix a tractor or whatever." Equipment from Hunt Family Farms was used at the hog farm.

Defendant testified he lost landlords for Hunt Family Farms because he "[w]asn't getting things done on a timely basis" due to his "commitment to the hog operation." Defendant started living full-time in plaintiff's farmhouse starting in 2000 and lived there exclusively until 2012.

¶ 18    Defendant stated plaintiff decided to discontinue the hog operation sometime in 2007. According to defendant, plaintiff reasoned "she was tired of losing money and didn't want to put her paycheck into it anymore." The operation wound down in 2008. Plaintiff sold the farm in 2011.

¶ 19    On cross-examination, defendant stated his partnership with his parents was a written partnership for which he received Schedule K-1 tax documents. Defendant started helping with the hog farm in 1999, and when asked if he expected to be paid for his work then, defendant stated, "No. Absolutely not." Defendant moved in with plaintiff after they began a romantic relationship, and he did not pay rent, utilities, or household bills but contributed through his work on the hog operation, though he did not know where the money came from to pay utilities or household bills. Defendant agreed he went to great lengths to avoid being identified as a partner in plaintiff's bankruptcy proceedings, identifying instead as a creditor but denied this was an attempt to defraud the bankruptcy court. Defendant could not recall when the oral partnership was made but insisted it was not before plaintiff filed for bankruptcy. Defendant agreed when the partnership conversation happened, "[defendant and plaintiff were] both crying, [plaintiff] was distraught and fearful for *** her life." Defendant also agreed he and plaintiff never discussed the partnership again. Defendant further agreed he never received profits from the hog farm, never filed a partnership tax return for the hog farm, never received K-1s, and everything was in plaintiff's name. Defendant stated he believed they still had a hog partnership,

defining it as "[a]n oral binding commitment that neither one of us have settled yet." Defendant admitted Hunt Family Farms was underbid on farming grounds they had previously farmed.

¶ 20       John McIntire testified as an expert witness to hog farm management. McIntire valued the services of a manager of a hog farm the size of plaintiff's to be approximately $35,000 per year. On cross-examination, he acknowledged his information of defendant's work was based only on the information defendant told him.

¶ 21       Plaintiff testified she and her ex-husband split work on the hog farm equally when they were married. After her divorce, plaintiff spoke to defendant about her financial problems, and defendant recommended a bankruptcy attorney. Plaintiff was working full time as a registered nurse. Plaintiff testified her ex-husband stopped coming to the hog farm to work and her son helped out in addition to defendant. Plaintiff denied defendant ever discussed with her "the conditions under which he was willing to help [her] run the operation in an effort to save the farm[.]" Plaintiff testified the work was split evenly among defendant, herself, and her son. Defendant would ask his brother to help out with some maintenance, but plaintiff testified she did not know how often he was there. Plaintiff stated she would mark hogs for market the night before, as defendant "was never [a] very good eye at guessing the weight of the hogs." Defendant's trailer was used to haul the hogs. Plaintiff stated defendant was an authorized signer on the hog farm account, as well as her personal checking account. Plaintiff denied defendant made breeding decisions for the hogs. Plaintiff paid all the bills. When asked if defendant contributed significant time and energy to the hog farm, plaintiff stated, "He contributed time, I wouldn't do want to go as much to say as significant." She stated she would consider a "50/50" split of time significant. Plaintiff testified she decided to discontinue the hog operation in 2007 because "I was losing money on 'em." She began liquidating the hog operation thereafter.

¶ 22                                    2. *Plaintiff's Case*

¶ 23        Tony Heitzig, regional president of CNB Bank, testified between 2007 and 2011 he was the senior vice president in lending. Heitzig testified plaintiff refinanced her hog farm property around 2007 in her own name. Heitzig denied plaintiff ever mentioned defendant claiming an interest in the hog farm, which would have been important information for refinancing. Heitzig assumed the hog farm was only plaintiff's because it "was her property and that's where the hogs were kept ***."

¶ 24        Don Samson testified he had acted as plaintiff's bankruptcy attorney. He met with plaintiff "probably a couple a dozen" times during the bankruptcy from filing in 1999 until discharged in 2006. Defendant accompanied plaintiff to the "vast majority" of the meetings. Samson testified their relationship appeared to be romantic. It was Samson's understanding plaintiff owned the hog operation and the real estate on which the hog farm operated. He testified neither defendant nor plaintiff ever indicated or held themselves out to be partners in the hog operation. Samson indicated a partnership agreement would be important to tell a bankruptcy court. Samson testified defendant never made a claim to hog farm profits. On cross-examination, Samson stated defendant actively participated along with plaintiff in meetings. Samson stated defendant was "helping [plaintiff] out with the operation." Samson stated it would be prohibited for two parties to enter a profit sharing agreement during a bankruptcy, even if the profits would not be distributed until after the bankruptcy was discharged.

¶ 25        Plaintiff testified further and discussed work she did on the farm no one else could do. These included working with "hot nurseries," marking hogs for sale, and artificial insemination. She denied there were any jobs defendant did no one else would do. She testified the hog pits, where liquid manure was stored, would overflow when defendant was working the

farm while she was at work, which risked the EPA shutting the hog farm down. Plaintiff stated she had her own equipment to run the hog farm but would use defendant's equipment "[m]aybe a couple times a year." She alone made the decision to wind down the hog operation. Defendant did not participate when plaintiff refinanced her property and did not receive any proceeds. Defendant never asked for nor received any proceeds from selling the hog farm property, nor did he complain he did not receive proceeds. Plaintiff paid all of the capital gains tax from the sale of the property. Plaintiff testified defendant never discussed a partnership with her and, when asked why defendant would claim such a conversation occurred, plaintiff stated, "I have no clue." Plaintiff denied the hog operation ever made a profit after the bankruptcy was discharged.

¶ 26 At the close of evidence, the parties agreed to submit written closing arguments. The trial court stated,

> "[T]here's a Motion to Dismiss because the statue of frauds and in that point in time it may have been just my misunderstanding. I didn't understand it at that time to involve the real estate itself. I thought it was the farm the hog operation. Obviously from the arguments made your [*sic*] seeking to recover value of the property which does involve the statue of frauds since it is a piece of property. Now, there are exceptions to the to the *** statue of frauds even when it's not in writing ***[,] the court must find that the terms of the contract are clear and definite and unequivocal. That the contract has been at least partially performed by the 1 party seeking the remedy at that the *** acts allegedly done in performance are positively attributable exclusively to the contract. Everybody understand what I want to hear on—I want you to touch upon that particular issue. 'Cause as I said *** the first Motion to Dismiss it was I *** interpreted the hog

- 8 -

operation to be the hog operation. I did not in fact I think in my notes in the court order the cause of action while the cause of action is prolifically related to real estate the real estate in my mind was not at issue. Obviously, things have changed at least from the court's perspective and clearly at issue. *** [I]t's the biggest part of what you're seeking. So, we need to address that issue in your closing arguments."

The parties submitted written closing arguments, including argument as requested on the Statute of Frauds. Defendant argued the Statute of Frauds was not at issue where (1) "[t]he [p]artnership [a]greement did not contemplate, involve or require a transfer of land," (2) barring the claim would perpetuate fraud, (3) the partnership was a partnership at will and could have been abandoned in less than one year, (4) the partnership only tangentially relates to land, and (5) defendant fully performed the contract. Plaintiff argued the Statute of Frauds was at issue where defendant was claiming an interest in the equity in real estate, which "is the same as claiming an interest in the real estate—they cannot be distinguished or separated."

¶ 27                                 3. *The Trial Court's Decision*

¶ 28            On August 16, 2019, the trial court decided the case in a written order. The court listed the evidence it found to be "most relevant and persuasive" as follows:

> "1. No written agreement was entered between the parties as to the hog operation partnership. On the other hand, [defendant's] other farming partnership with his parents was in writing and there were partnership tax returns and K1 filings. No such returns or filings were created in the alleged hog operation partnership. Further [defendant] admitted he had no responsibilities for any bills incurred by this partnership.

2. [Defendant] testified he discussed this partnership with family members extensively prior to entering into it with [plaintiff] and yet no family member testified to confirm these discussions.

3. The alleged partnership involved [plaintiff's] real estate which it appeared [defendant's] attorneys understood to be problematic. In view of the Statute of Frauds an attempt at trial was made to avoid this problem by suggesting that the partnership only involved the increase in value of the real estate as opposed to the real estate itself.

4. [Defendant], who was primarily a grain farmer who had pasture hogs (but not since the late 1970's), brought no specific expertise in the operation of a breeder hog operation. Most of the important decisions regarding the breeding operation, [*e.g.*], mating the hogs with sows, the timing of gestation and the culling of the breeding stock were made by [plaintiff]. Furthermore, [defendant] himself acknowledged that low hog prices were 75% of the problem that led to [plaintiff's] bankruptcy filing and that the prices increased thereafter.

5. [Defendant] testified his brother also helped with the hog operation 5 ½ days per week and yet his brother was not called to testify to verify these allegations.

6. [Defendant] testified that because of the time he devoted to the hog operation Hunt Family Farms suffered and that he lost several cash rent farms because of it. No details regarding these alleged lost farms were provided and on cross-examination [defendant] admitted that Hunt Family Farms were simply underbid on State of Illinois farms they had previously farmed.

7. Finally, and most importantly, the court did not find [defendant's] testimony to be credible. His memory was poor on events or conversations that were contrary to his argument that a partnership existed. An excellent example of this was when he expounded expansively on all of the ways he led [plaintiff] through the bankruptcy proceedings although his failure to disclose the 'partnership' may have subjected [plaintiff] to charges of bankruptcy court fraud. Further, Don Samson, the attorney who handled the bankruptcy for [plaintiff,] testified at length and he not only failed to confirm the 'important role' [defendant] played but also directly repudiated several of [defendant's] assertions."

The trial court continued to discuss defendant's romantic relationship and living situation with plaintiff. Finally, the court noted "it is not lost on the court that despite the fact that litigation had been ongoing *** since August of 2012 that no mention and no pleadings relating to a hog operation partnership was raised until September of 2015." The court determined defendant "failed to meet his burden of proof" to demonstrate a partnership existed.

¶ 29 On September 16, 2019, defendant filed a motion to reconsider. The trial court denied the motion.

¶ 30 This appeal followed.

¶ 31                                 II. ANALYSIS

¶ 32                             A. Standard of Review

¶ 33 As an initial matter, defendant asserts this appeal "presents the question of why the trial court did not apply the law of implied partnerships to the facts in finding that a partnership did not exist." As such, defendant contends this appeal presents a question of law,

denoting *de novo* review. We disagree. Defendant's arguments all contend the trial court erred by determining no partnership existed, whether by oral agreement or "by implication." Defendant does not point to any error by the trial court where the court failed to apply the proper law when rendering its decision.

¶ 34 "Whether a partnership exists is a question to be determined by the fact finder from all the facts and circumstances presented." *Argianas v. Chestler*, 259 Ill. App. 3d 926, 942, 631 N.E.2d 1359, 1369 (1994). "[T]he trial court is in a superior position to make determinations on the credibility of the evidence, and only where the trial court's findings are against the manifest weight of the evidence will a reviewing court overturn the trial court's decision." *Maloney v. Pihera*, 215 Ill. App. 3d 30, 42, 573 N.E.2d 1379, 1387 (1991). A determination "is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350, 860 N.E.2d 240, 245 (2006). In determining whether the trial court's findings were against the manifest weight of the evidence, a reviewing court "may not reconsider the evidence or reassess the witnesses' credibility or demeanor." *Chandler v. Maxwell Manor Nursing Home, Inc.*, 281 Ill. App. 3d 309, 318, 666 N.E.2d 740, 747 (1996).

¶ 35 B. Partnership

¶ 36 The Uniform Partnership Act (1997) (805 ILCS 206/100 *et seq.* (West 2014)) defines a partnership as "an association of 2 or more persons to carry on as co-owners a business for profit forms a partnership ***." (805 ILCS 206/101(f) (West 2014)). Although the intent to form a partnership arrangement is not required, a partnership is a contractual relationship and there must be a meeting of the minds to the terms of the agreement. *Maloney*, 215 Ill. App. 3d at 43. When there is no written agreement, the existence of a partnership "must be determined from

the language and conduct of the parties and from all the facts and circumstances surrounding the transaction." *Argianas*, 259 Ill. App. 3d at 942. Factors material to determining the existence of a partnership include (1) the manner in which the parties have dealt with each other, (2) the mode which each has, with the knowledge of others, dealt with persons in a partnership capacity, (3) whether the alleged partnership has advertised with a firm name, and (4) whether the alleged partners shared the profits. *Seidmon v. Harris*, 172 Ill. App. 3d 352, 357, 526 N.E.2d 543, 546 (1988). "The burden of proving the existence of a partnership rests on the party asserting it." *Id.*

¶ 37     In this case, defendant has made several contentions of error by the trial court, including the trial court erred by considering (1) the absence of a written agreement, (2) the absence of testimony from defendant's family members, (3) the Statute of Frauds, (4) defendant's level of expertise as to "hog operations," (5) appellant's credibility, (6) the parties' romantic and living arrangement, and (7) the timing of the counterclaim as to the partnership. Defendant's contentions of error, however, treat each of these factors as though they are considered in a vacuum. When determining whether a partnership exists when there is no written agreement, the trial court must look to "all the facts and circumstances surrounding the transaction." *Argianas*, 259 Ill. App. 3d at 942. When we look at the totality of the evidence, and the factors material to determining the existence of a partnership, we find the trial court's determination no partnership existed was not against the manifest weight of the evidence.

¶ 38     While the individual absence of partnership tax returns, a partnership agreement, or a partnership account would not necessarily be fatal to finding the existence of a partnership, "they may collectively be strong evidence that there was in fact no partnership." *In re Estate of Kime*, 42 Ill. App. 3d 505, 509, 356 N.E.2d 350, 353 (1976). In this case, no such documentation was presented for the hog farm. Everything related to the hog farm was in plaintiff's name,

- 13 -

defendant never received partnership profits, no partnership tax returns were filed, and defendant did not receive a K-1 tax form. Defendant claims to have specifically avoided disclosing the partnership during plaintiff's bankruptcy, despite the risk nondisclosure would have had on plaintiff's bankruptcy. No written documents were presented to support defendant's claims of a hog partnership.

¶ 39 The trial court did not find the primary source of evidence of a partnership, defendant's testimony, to be credible. As discussed, we will not reassess the credibility of a witness unless the trial court's determination is against the manifest weight of the evidence. See *Maloney*, 215 Ill. App. 3d at 42. In this case, a determination defendant's testimony was not credible is not against the manifest weight of the evidence. Defendant claimed the partnership was formed in a single conversation in which plaintiff agreed to give defendant a 50% stake in her business for his assistance, yet he could not testify to any other terms of the supposed partnership. Further, there was no evidence presented to support defendant's claims. No witnesses testified to corroborate defendant's testimony he discussed the partnership with his family. In fact, the testimony of both plaintiff and Samson undermined several of defendant's claims. We see no reason to question the trial court's determination defendant was not a credible witness.

¶ 40 As the only definitive evidence of a partnership presented to the trial court was defendant's testimony, and no other evidence demonstrated plaintiff had a "meeting of the minds" with defendant as to the terms of a partnership agreement, it was not against the manifest weight of the evidence for the trial court to determine defendant failed to meet his burden of proof as to the existence of a partnership.

¶ 41 III. CONCLUSION

¶ 42        For the reasons stated, we affirm the trial court's judgment.

¶ 43        Affirmed.